PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

CHRISTOPHER WAYNE SIMPSON,

      Defendant-Appellee.

No. 09-4127

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:08-CR-554 CW)**

Daphne Oberg, Utah Federal Public Defender's Office (Steven B. Killpack, Utah Federal Defender, and Scott Keith Wilson, Assistant Federal Defender, with her on the briefs) Salt Lake City, Utah, for Defendant-Appellant.

Stephen J. Sorenson, Acting Assistant United States Attorney, (Carlie Christensen, United States Attorney, with him on the brief) Salt Lake City, Utah, for Plaintiff-Appellee.

Before **HENRY**, **MURPHY** and **O'BRIEN**, Circuit Judges.

**HENRY**, Circuit Judge.

Christopher Wayne Simpson challenges the denial of his motion to suppress narcotics found in his vehicle, asserting that a state trooper lacked reasonable suspicion to detain him past the legitimate ending point of a traffic stop. Although a close call, we hold that the continued detention was justified because the trooper had reasonable suspicion that Mr. Simpson was engaged in illegal conduct. Mr. Simpson's prior criminal conviction for drug trafficking, his extreme nervousness, and the fact that he provided inconsistent and evasive answers to queries about his travel plans together provided reasonable suspicion to justify extending a legitimate traffic stop to allow further questioning and a canine sniff of his automobile. Accordingly, the district court appropriately denied Mr. Simpson's motion to suppress.

## I. BACKGROUND

### A. Stop and search

On July 30, 2008, Nicholas Bowles, a Utah Highway Patrol Trooper, was working a drug interdiction assignment on Interstate 80 near Salt Lake City when he saw Mr. Simpson's Lexus driving eastbound. Trooper Bowles claimed that Mr. Simpson's car drew his attention because he was driving well below the speed limit, had his windows rolled down despite 95 degree heat, and appeared to be dragging something.

Trooper Bowles began to follow Mr. Simpson's car. He witnessed Mr. Simpson twice make lane changes without the required two-second delay after signaling. Trooper Bowles decided to pull Mr. Simpson over for this traffic violation. After the trooper

2

signaled for him to pull over, Mr. Simpson stopped in the emergency lane, relatively close to the flow of traffic.

Trooper Bowles approached Mr. Simpson's car and saw the following: butane lighter refills in the rear pocket of the front passenger seat; a butane lighter in the ashtray; and a radar detector on the floor, pushed partly under the seat. When Mr. Simpson opened the glove compartment to retrieve a document, the trooper saw a package of energy pills.

Trooper Bowles instructed Mr. Simpson to exit his vehicle and to sit in the patrol car. Once in the patrol car, Trooper Bowles noticed Mr. Simpson's whole body trembling nervously. Trooper Bowles contacted dispatch and proceeded to question Mr. Simpson while waiting for dispatch to respond with a license and registration check. After a few minutes Trooper Bowles, who did not have any paper tickets available, told Mr. Simpson that he only would be given a warning for a traffic violation. Trooper Bowles stated that he did this to see if it would relieve the tension Mr. Simpson was experiencing. According to Trooper Bowles, this information did not make Mr. Simpson less nervous.

While sitting in the patrol car, Trooper Bowles questioned Mr. Simpson about his travel plans. He found that Mr. Simpson was vague and evasive in answering several other questions about his trip. Mr. Simpson told Trooper Bowles that he left Nebraska late Saturday or early Sunday, spent two and a half days driving to Reno, and had begun driving back to Nebraska on the Wednesday when Trooper Bowles stopped him. *See*

3

Supp. Rec. vol. I, at 57. Trooper Bowles claimed that he was suspicious of Mr. Simpson's story that he went to Reno but did not go out or visit a casino and instead spent only a single night gambling at his friend's home.

Trooper Bowles also testified that while he spoke to Mr. Simpson in the patrol car, he witnessed Cica, his drug-sniffing dog, shred his "reward toy." Trooper Bowles stated that the only other time Cica had exhibited such behavior was when there was a person in the patrol car who was found with marijuana. *Id.* at 59–61.

Additionally, Trooper Bowles noted that Mr. Simpson was traveling on "the major drug corridor in Utah . . . . [I-80] is used frequently to transport narcotics." *Id.* at 63.

Trooper Bowles heard from dispatch that Mr. Simpson had previously been charged in Nebraska for transporting drugs. Trooper Bowles then notified Mr. Simpson that he would only receive a warning and Mr. Simpson then exited the vehicle. *Id.* at 64. At this point, Trooper Bowles inquired if he could ask him some more questions. After Mr. Simpson indicated that he wanted to continue on his way, Trooper Bowles instructed him to return to the vehicle.

Trooper Bowles then had the drug canine, Cica, sniff the exterior of the Lexus. The first time sniffing the exterior, Cica did not alert Trooper Bowles to any drugs. Trooper Bowles then "detail[ed]" Cica to again sniff particular areas of the car, and this time, Cica alerted to the presence of drugs. *Id.* at 67–69. After this alert, Trooper Bowles searched the car and found a kilogram of methamphetamine; 40 grams of heroin; eight syringes loaded with heroin; marijuana; prescription pills; and drug paraphernalia.

4

B. <u>District Court Proceedings</u>

Before the district court, Mr. Simpson filed a motion to suppress the evidence found in his vehicle. Mr. Simpson did not challenge the initial stop of his vehicle. Instead he argued that his continued detention violated the Fourth Amendment because Trooper Bowles lacked reasonable suspicion to continue the detention once the initial stop had in essence "ended." In response, the government argued that Trooper Bowles had reasonable suspicion to continue to detain Mr. Simpson, and proceed with the canine sniff of his car. In the government's view, the subsequent search of the car was valid under the automobile exception because the "alert" by the dog constituted probable cause for such a search. Mr. Simpson's motion thus turned on whether Trooper Bowles had reasonable suspicion to detain Mr. Simpson past the time necessary to resolve the traffic violation.

In rejecting Mr. Simpson's motion, the district court held that Trooper Bowles had an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring. It included a list of fifteen facts that formed the basis of that suspicion:

1. Mr. Simpson was driving well below the speed limit;
2. Mr. Simpson had his windows rolled down on a very hot day;
3. Mr. Simpson appeared to be avoiding Trooper Bowles by twice changing lanes;
4. Mr. Simpson had a butane lighter and refills in the car;
5. Mr. Simpson had energy pills in the glove box;
6. Mr. Simpson had a radar detector that it looked like he was hiding;
7. Mr. Simpson was so nervous that his whole body was shaking;
8. Mr. Simpson's nervousness did not subside when Trooper Bowles told him he was only to issue a warning;

9. Mr. Simpson said he stayed in Reno a few days, but given the time frame he gave Trooper Bowles, the most he could have stayed was one night;
10. Mr. Simpson's trip was economically infeasible, given the high price of gas, the distance traveled, and the amount of time Mr. Simpson spent in Reno;
11. Mr. Simpson gambled at his friend's house instead of the casinos;
12. Mr. Simpson seemed vague in answering questions;
13. Cica tried to shred his reward toy, which Trooper Bowles had only observed once before, when there was a person in the car who was found with marijuana;
14. Mr. Simpson was driving on a major drug corridor from a place where drugs often come from to a place drugs often go to; and
15. Mr. Simpson had a previous drug running charge.

Rec. vol. I, at 89-90 (Order & Memorandum Decision, filed Feb. 27, 2009).

When interpreting these facts, the district court appropriately gave strong weight to Trooper Bowles's experience and training: "Trooper Bowles was allowed to make reasonable judgments based on his experience in drug enforcement to assess the circumstances he encountered at the time. This conclusion holds even though many of the facts are capable of innocent explanation." *Id.* at 91; *see United States v. Wood*, 106 F.2d 942, 946 (10th Cir. 1997) ("[D]eference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions."). In concluding that there was reasonable suspicion here, the court emphasized four specific facts: (1) Mr. Simpson's nervousness; (2) Mr. Simpson's vagueness and contradictions and "the implausibility of his story," Rec. vol. I, at 92; (3) Mr. Simpson's previous conviction for transporting drugs; and (4) Cica's trying to shred his reward toy. *Id.* The district court concluded that the "remaining facts cited by the government range from weak . . . to nearly weightless . . . the court views them as part of the totality of the circumstances."

6

*Id.* Taken together, all the facts provided Trooper Bowles with reasonable suspicion to detain Mr. Simpson beyond the initial traffic stop. Accordingly, the court denied Mr. Simpson's motion to suppress.

## II. ANALYSIS

On appeal, Mr. Simpson argues that the district court erred in denying his motion to suppress. As in the district court proceedings, he does not challenge his initial detention, but instead argues that Trooper Bowles lacked reasonable suspicion to detain him after announcing that Mr. Simpson would only receive a warning. *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) ("The traffic stop may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." (internal quotation marks omitted)).[1]

### A. Reasonable Suspicion and Standard of Review

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. One type of seizure is an investigatory stop, which is reasonable only if "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411,

---

[1] Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop. *Wilson v. Sirmons*, 536 F.3d 1064, 1110 (10th Cir. 2008).

417 (1981). Unlike an arrest, which requires probable cause, these brief detentions are constitutional based on the lesser standard of reasonable suspicion: the officer must have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).

The government bears the burden of proving the reasonableness of the officer's suspicion. *United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004). In evaluating whether the district court correctly found that the trooper here had reasonable suspicion for his continued detention of Mr. Simpson, we must view the evidence presented at the suppression hearing in the light most favorable to the government. *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009), *cert. denied* __ S.Ct. __, 2010 WL 286431 (March 1, 2010). Moreover, this court defers to the district court's finding of facts and reviews them solely for clear error, even when, as here, there is video tape of the stop and detention. *United States v. Santos*, 403 F.3d 1120, 1128 (10th Cir. 2005) ("The increasing availability of videotapes of traffic stops due to cameras mounted on patrol cars does not deprive district courts of their expertise as finders of fact, or alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts."). Although we defer to the district court's factual findings, we review de novo the district court's legal conclusions, specifically, that the officer had reasonable, articulable suspicion of criminal activity at the time of the seizure. *See United States v. Carhee,* 27 F.3d 1493, 1496–97 (10th Cir. 1994).

As courts have often repeated, the existence of objectively reasonable suspicion of illegal activity "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993).  In deciding whether the government has met its burden of showing reasonable suspicion, we "judge the officer's conduct in light of common sense and ordinary human experience," *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997), and we accord deference to an officer's ability to distinguish between innocent and suspicious actions.  *Wood*, 106 F.3d at 946; *see also United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994) (observing that deference is owed to police officer's ability to assess suspiciousness of seemingly innocent conduct).  Thus, "[t]he evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*."  *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (internal quotation marks omitted) (emphasis in original).

The deference owed to the officer's judgment, however, is not unlimited.  Even though reasonable suspicion may be founded upon factors consistent with innocent travel, *see United States v. Sokolow*, 490 U.S. 1, 9–10 (1989), "[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous."  *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996), *overruled on other grounds by United States v. Holt*, 264 F.3d 1215, 1226 n.6 (10th Cir. 2001) (en banc).  Moreover, the officer must point to specific, articulable facts.  *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir. 1994).   Inchoate suspicions and unparticularized hunches do not provide reasonable suspicion. *Id.*

9

B.  Do the Factors here establish Reasonable Suspicion?

1.  Criminal History

"[I]n conjunction with other factors, criminal history *contributes powerfully to the reasonable suspicion calculus.*"  *White*, 584 F.3d at 951 (quoting *Santos*, 403 F.3d at 1132) (emphasis in original).  Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior.  *See Santos*, 403 F.3d at 1132 ("To be sure, this Court has held that a prior criminal history is by itself insufficient to create reasonable suspicion.  People with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches.  But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." (internal citations omitted)).  Here, Trooper Bowles's knowledge that Mr. Simpson had a previous criminal history involving drug transportation weighs heavily in favor of finding reasonable suspicion.

2.  Extreme Nervousness

"We have held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists."  *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001) (quoting *United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000)).  Nervousness is of limited value in assessing reasonable suspicion for two reasons.  First, it is common for most citizens, "whether innocent or guilty—to exhibit signs or nervousness when confronted by a law enforcement officer."  *Wood*, 106 F.3d at

10

948; s*ee also Santos,* 403 F.3d at 1127 ("[N]ervousness is a sufficiently common-indeed natural-reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." (internal quotation marks omitted)). Further, it is natural for a motorist to become more agitated as a stop is prolonged and particularly when the officer seems skeptical or suspicious. *Id.* at 1128–29 ("For a motorist to become more nervous as the questioning becomes more prolonged and skeptical is not unnatural.").

Second, unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously. *Wood*, 106 F.3d at 948 (emphasizing the difficulty in making a proper assessment of what is normal nervousness when an officer "had no prior acquaintance with [the defendant] which enabled the trooper to contrast [the defendant's] behavior during the traffic stop with his usual demeanor"); *accord United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992) ("Nothing in the record indicates whether [a Border Patrol agent] had any prior knowledge of Defendant, so we do not understand how [the agent] would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to [the agent] is nothing more than an inchoate suspicion or hunch.") (internal quotation marks omitted), *overruled on other grounds by United States v. Little*, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994) (en banc).

11

Extreme and persistent nervousness, however, "is entitled to somewhat more weight." *United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000); *Williams,* 271 F.3d at 1268; *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (the court may still "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious action" (internal quotation marks omitted)).  The court examines specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion.  *See, e.g.*, *Santos*, 403 F.3d at 1127 (pointing to the following factors:  the defendant's changing the topic; swallowing hard; licking his lips which were quivering; and nervously stroking the top edge of the head liner of the patrol car with his hand).

Here, Trooper Bowles testified that Mr. Simpson exhibited extreme nervous behavior.  He recounted that he informed Mr. Simpson that he was only going to give him a warning ticket, which "seems to calm most people.  In this case it didn't. . . .  He remained nervous during the entire encounter.  Towards the end of the traffic stop I could still see his body trembling."  Rec. Supp. vol. I, at 54.

Given these justifiable concerns about crediting a claim of nervousness, we are somewhat reluctant to give substantial weight to that factor here.  Nonetheless, despite our concerns, we conclude that extreme nervousness is a relevant factor in the totality of the circumstances analysis.  Trooper Bowles did not merely assert that Mr. Simpson was nervous, he provided a basis for that conclusion—Mr. Simpson was shaking uncontrollably throughout the entire encounter, even when assured he would not get a

12

ticket. Although we do not know how Mr. Simpson normally behaves, it is probable that he does not exhibit full body tremors in all his interactions with others. And although Trooper Bowles did not provide significant detail, he did indicate that others who are nervous do calm down when assured they are not getting a ticket. Accordingly, we credit as a factor towards reasonable suspicion, albeit cautiously, Mr. Simpson's manifestation of extreme nervousness.

### 3. Inconsistent travel plans

"Implausible travel plans can contribute to reasonable suspicion." *Santos*, 403 F.3d at 1129; *see also White*, 583 F.3d at 951 ("[This court] ha[s] noted numerous times that implausible travel plans can form a basis for reasonable suspicion." (quoting *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007))). To assess that factor here, we must consider what constitutes an implausible travel plan.

The cases from this circuit are wide-ranging. We have credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee's description of them. For example, a police officer could reasonably believe a travel plan was implausible—and the person was lying—if that person claimed that he or she had left a certain city by car an hour ago if the officer pulled over that person, 200 miles from the city. To this extent, the factor seems non-controversial: lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion. In contrast, this circuit has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—

13

where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make. *Wood* and *Salzano* provide examples of the second category—travel plans that, though somewhat unusual, did not contribute to reasonable suspicion.

In *United States v. Wood*, the defendant was stopped by a trooper in Kansas driving a rental car. 106 F.3d at 944. When the trooper asked where he had rented the car, the defendant told him San Francisco. The officer then examined the rental papers and found that the car had been rented in Sacramento. The officer also noticed that the car was due back to Sacramento the next day. When confronted with this, the defendant "promptly corrected his error, and confirmed that the car had indeed been rented in Sacramento." *Id.* The defendant also informed the trooper that "that he was traveling in the car only one way, and that the rental company was aware of his plans. [He] explained that he had flown with his sister to Sacramento on a vacation, and that she had returned by plane to Topeka while he chose to drive to enjoy the scenery." *Id.* During this conversation, the defendant "also revealed that he was an unemployed painter but that he expected to return to work in about six weeks." *Id.*

This circuit concluded that those travel plans did not contribute to reasonable suspicion. We explained that "[t]here is nothing criminal about traveling by car to view scenery. Since Mr. Wood was unemployed and did not expect to return to work for another six weeks, his schedule permitted him the luxury of time to make such a trip." *Id.* at 947. We also disagreed with the district court and found that the inconsistency in

14

where the defendant rented the car was "not the sort of inconsistency that warrants . . . a conclusion [of reasonable suspicion of criminal activity]." *Id.*

Similarly, in *United States v. Salzano*, 158 F.3d 1107 (10th Cir. 1998), the court found the plans unusual but not suspicious. There, a Kansas Highway Patrol Trooper stopped a defendant who was driving in a motor home on the highway. The defendant explained to the Trooper that he was traveling on vacation. In response to questions about the "relative expense of renting a motor home to drive across country, compared to flying or renting a smaller vehicle, [the defendant] replied that he planned to drive his father back to California and that they might visit some friends in South Dakota." *Id.* at 1110. The Patrol Trooper also "noted that the rental papers handed him by [the defendant] indicated that a party of three would be traveling in the motor home, but [the defendant] was traveling alone." *Id.* The government argued that "Mr. Salzano's uneconomical decision to travel across the country in an expensive motor home at a rental cost of $3,900 and a fuel cost of approximately $1,000 [and] the discrepancy between the number of persons stated on the rental agreement and the fact that Mr. Salzano was traveling alone" were both factors that contributed to reasonable suspicion. *Id.* at 1111.

We rejected the government's argument, emphasizing that "[s]imply because the officer would not have chosen a particular vehicle for travel does not make that choice

15

indicative of criminal activity." *Id.* at 1112.[2]  In finding that the discrepancy between the number of people who would be traveling as stated on the rental agreement and the number who were actually traveling, the court provided a number of reasonable explanations, and stated that "[w]hatever the case, the discrepancy between the stated number of occupants on the motor home rental agreement and the actual number occupying the vehicle at the time of the stop can readily be explained and is 'so innocent or susceptible to varying interpretations as to be innocuous.'" *Id.* at 1113 (quoting *Wood*, 106 F.3d at 946).

By contrast, the court has found vague, inconsistent or evasive answers with respect to travel plans supportive of reasonable suspicion.  For example, in *United States v. Santos*, 403 F.3d at 1130, we found reasonable suspicion because the defendant "gave vague, evasive, and inconsistent answers concerning his length of stay. . . .  Defendant knew his mother's address, but not her telephone number. . . .  Defendant's sister had a secure job in New York but was moving to California without having a job there." *Id.* This court accepted these answers as contributing to reasonable suspicion, recounting that:

> Mr. Santos stated he would stay in New York "about a week or so," and later amended this to "three or five days." At first, he called his sister his "sister," and later said she was really his "half-sister." He

---

[2] *But see United States v. McRae*, 81 F.3d 1528, 1535 (10th Cir. 1996) ("[D]efendant's evident lack of concern about how he would return the rental car display[ed] an unusually cavalier attitude towards a financial obligation most people take quite seriously [and thus] contributed to a reasonable suspicion.").

did not provide specifics regarding the duties his sister performed for the DMV, and said he did not know his mother's telephone number or the ages of his sister's children.

*Id.* at 1131.

Although by themselves, these fairly minor evasions and inconsistencies would not constitute reasonable suspicion "[a]s part of the totality of the circumstances, [the trooper] was entitled to view Mr. Santos's answers as some indication that his story about going to New York to pick up his sister was just that: a story. Confusion about details is often an indication that a story is being fabricated on the spot." *Id.* Nevertheless, we added that "the inconsistencies and gaps in his story were not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing." *Id.* Accordingly, we did not "give much independent weight to this factor. But in conjunction with other factors, it contributed to [the trooper's] determination of reasonable suspicion." *Id.*

Similarly in *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995), the court emphasized that the defendant's "explanation of his travel plans and purpose was not plausible, nor was it completely consistent with the explanation his passenger gave." In that case, the court pointed to a number of factors:

> First, [the Trooper] did not find it plausible that Defendant would drive from California to North Carolina merely to take a very dilapidated sofa to some friends. Second, [the Trooper] found suspicious Defendant's reference to "Shreveport" and his uncertainty as to where in North Carolina he was going. Third, [the Trooper] noted that Defendant's story was not consistent with [the passenger's], in that Defendant said they intended to return to California after Christmas but [the passenger] said they intended to

17

> return before Christmas, within a few days of December 14. Fourth, [the passenger] gave inconsistent responses concerning how long he had known Defendant and how long he had been living in California.

*Id.* at 1453–54.

Finally, in *White*, the defendant, after being stopped in Kansas on October 2, explained that he had flown to Las Vegas and spent four days there. 584 F.3d at 942. The defendant explained he then rented a car on October 1 and that he and a friend intended to drive to Indianapolis, where the defendant had to be at work on October 3. *Id.* The pair intended to drive the car back to Las Vegas by October 4. *Id.* On appeal, the court credited this "bizarre" story as a factor that contributed to establishing reasonable suspicion in the case. *Id.* at 942–43, 951.

Here, we must consider whether Mr. Simpson's account of his travel plans was merely unusual or whether, in contrast, was sufficiently bizarre, inconsistent and evasive to constitute a factor contributing to reasonable suspicion. In opposing Mr. Simpson's motion to suppress, the government asserted that his travel plans were suspicious in three ways: (1) he went to Reno, did not gamble at any casinos, and stayed at his friend's house to gamble; (2) he drove a far distance to only spend one night in Reno; and (3) he was evasive and inconsistent about his plans, particularly in stating when he left, when he was heading back, and when he needed to be back.

In Trooper Bowles own words;

> [I] [a]sked him where he stayed. He told me that he stayed at his friend's house.

18

I asked him what casinos he gambled at. He informed that he didn't go to any casinos, he only played 21 at his friend's house.

I asked him – when I asked him where he stayed, he starts giving me street names. I mean a simple at my friend's house would have been fine.

I asked him for his friend's name and he – it appeared to me that he was really stalling. You know, we only talked about one friend. It apparently confused him when I asked him for his friend's name.

He started asking me questions. And that's something I've found to be consistent with drug traffickers because they have to make up a story. So when I ask a question that they hadn't thought of, they ask me questions, they stall so they can think of an answer.

. . . .

I just . . . didn't feel like he was being truthful with me. I then kind of went into more, I wanted to get more detail on his actual travels. As I stated, he claimed to have been out in Reno for a couple of days staying with his friend, but when I pinned him down on when he left and how long it took him to drive there, he basically would have spent one night in Reno, which I mean seems very unusual to me to drive from Nebraska to Reno to stay one night just to play 21 your friend's house.

Rec. vol. 2, part 1, at 225–26.

Trooper Bowles's testimony that based on his experience he believed that Mr. Simpson was being evasive is entitled to deference by this court. In light of this circuit's precedent, Mr. Simpson's description of his travel plans is a relevant factor in the reasonable suspicion calculus.

Similarly, the timeline of Mr. Simpson's travel plans is relevant. That Mr. Simpson chose to drive a long distance to spend a single night in Reno and could not easily recount when he left or when he planned to return, contributes to a finding of suspiciousness. *See Sokolow*, 490 U.S. at 9 ("While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here

19

there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."). Although we agree that suspiciousness cannot be based simply on the fact that a person is making unusual travel plans, or plans that an officer would not have chosen to make, the facts here go beyond that and are more akin to the "bizarre" travel plans that contributed to reasonable suspicion in *White*. 584 F.3d at 951. We, however, provide no weight to the government's assertion that Mr. Simpson's failure to gamble in a casino is suspicious. Where the defendant chooses to gamble or not to gamble cannot reasonably or fairly contribute to reasonable suspicion. Some individuals cannot afford to gamble in a casino or might prefer to stay at home to visit with friends—both are reasonable choices.

Again, it is worth noting that if Mr. Simpson's evasiveness about his "bizarre" travel plans were the only factor being used to establish reasonable suspicion, it would be insufficient by itself to establish reasonable suspicion. Like the court in *Santos*, we find that Mr. Simpson's travel plans by themselves were of limited significance. However, in conjunction with the other factors presented in this case, they are deserving of some weight.

### 4. Other asserted factors

We give little weight to the other factors asserted by the government. Specifically, the items that the trooper saw in the car (the butane lighters, the radar detector, the energy pills) are of little or no significance. The presence of butane lighters or energy pills adds

20

no weight to the reasonable suspicion analysis as it would be likely to find such items in the vehicle of any innocent traveler. *See Wood*, 106 F.3d at 947 ("Remnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways.").

Similarly we give minimal weight to the dog trying to shred its reward toy. A trained and reliable alert from a narcotics dog can provide support for an officer to conduct a search. *Clarkson*, 551 F.3d at 1203 ("This court has further indicated the narcotics dog must be 'reliable' or 'trained' in order for an alert to support probable cause." (quoting *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997))). Although the narcotics canine in this case was trained and reliable, there is no indication that this behavior—trying to shred its reward toy—was a trained or reliable response that should be credited as part of the reasonable suspicion analysis. To detain a person based, even in part, on a dog's behavior when that behavior is not a trained reaction and when the trooper has only observed the behavior one other time, is not sufficiently reliable.[3]

### 5. Totality of the factors

Trooper Bowles clearly was suspicious of Mr. Simpson—he continued questioning him about his travel plans while waiting for the license plate check, and, then

---

[3] We also give no credence to Trooper Bowles's testimony that Mr. Simpson was traveling on a major "drug corridor." Rec. Supp. vol. I, at 63. "Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal." *White*, 584 F.3d at 951–52.

he ordered him to stay in the Trooper's car so that he could bring the canine to sniff Mr. Simpson's vehicle. The question is whether this suspicion was "reasonable" and "articulable rather than a hunch that turned out accurate." *See Sokolow*, 490 U.S. at 7 (observing that an officer's "inchoate and unparticularized suspicion or hunch is insufficient to give rise to reasonable suspicion" (internal quotation marks omitted)).

In essence, we are asked to decide whether a police officer who has lawfully stopped a person is allowed to continue to detain that person for a short period of time when that person has a criminal record of drug trafficking, is acting extremely nervous in a situation where others typically relax, and provides evasive answers that describe a fairly implausible travel plan. We must determine whether the Constitution demands that a police officer in such a situation to cease the immediate investigation and let that person go on his way.

Although a close call, we conclude that Trooper Bowles had reasonable suspicion that criminal activity was afoot, and thus, had the right to briefly detain Mr. Simpson for further investigation. Reasonable suspicion is not, and is not meant to be, an onerous standard. Mr. Simpson's record of prior criminal activity enhanced the suspicious nature of the other factors. All of them combined permitted Trooper Bowles to constitutionally continue questioning Mr. Simpson, and submit his vehicle to a drug sniff by a trained dog. *See Arvizu*, 534 U.S. at 277 (stating that "each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others" but concluding that together the individual favor provided reasonable suspicion). This circuit has

22

previously held, in *White*, that these three factors were sufficient to provide reasonable suspicion, and under the facts before us, we reach the same conclusion.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the district court's denial of the defendant's motion to suppress is AFFIRMED.