2011 UT App 209

STATE of Utah, Plaintiff and Appellee,

v.

Gary DUHAIME, Defendant and Appellant.

No. 20091017–CA.

Court of Appeals of Utah.

June 30, 2011.

G. Fred Metos, Salt Lake City, for Appellant.

Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ORME.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Gary Duhaime appeals the trial court's ruling on his motion to suppress marijuana evidence seized following a traffic stop of his vehicle. We reverse and remand.

## BACKGROUND

¶ 2 On January 14, 2009, a highway patrolman out looking for drug activity observed a Lincoln Town Car with Texas license plates, driven by Duhaime, traveling eastbound on Interstate 80 in Summit County. The patrolman ran a check on the car's license plate number and discovered that it was a rental car. The patrolman claimed that the rear license plate light was not working. He also observed the driver make what the patrolman claimed to be an illegal lane change. At approximately 11:06 p.m., on the pretext of the foregoing violations, the patrolman pulled the car over.[1] The encounter with Duhaime and his wife (Wife) was recorded by a camera in the patrolman's vehicle.

¶ 3 The patrolman approached the car from the passenger side. He observed fast food containers, four cell phones, and a map in the front seat, as well as luggage in the back seat. Wife was sleeping in the passen-

---

1. Our supreme court approved the use of pretext traffic stops in *State v. Lopez*, 873 P.2d 1127 (Utah 1994).

ger seat and did not wake up for a "couple of minutes" after the patrolman pulled them over. The patrolman began questioning Duhaime about his travel plans. The patrolman informed Duhaime that he had made an illegal lane change and that his license plate was not properly illuminated. He also requested to see Duhaime's car rental agreement and his driver license. Duhaime had rented the car for $1,200 in Oakland, California, and intended to drop it off in Chicago, Illinois. The patrolman then continued to inquire about the details of the couple's travel plans, including where they were from, where they were going, who they were visiting, how long they planned to stay, how long they had been planning the trip, why they decided to drive rather than fly, when and where they planned to stop for the evening, and what they planned to do after their visit to Chicago. The patrolman considered several of Duhaime's answers to be inconsistent or suspicious and testified that Duhaime "was very, very nervous in answering questions about his trip, his origination and his destination."

¶ 4 After conversing with the couple for several minutes, the patrolman returned to his car and requested that another officer bring a dog to sniff the car for drugs. He returned to Duhaime's vehicle and gave him a verbal warning regarding the lane change and the license plate, apparently concluding the reason for the stop. He then asked Duhaime whether he had any illegal drugs in the car and requested to search the car. Duhaime denied having any drugs and refused consent. The patrolman informed Duhaime that he had called for a drug detection dog and that he intended to detain Duhaime until it came. When the dog arrived, it alerted on the trunk of the car, where the officers subsequently found seventy-six one-pound vacuum-sealed bags of marijuana. Duhaime was arrested and charged with possession of a controlled substance with intent to distribute, a third degree felony. *See*

Utah Code Ann. § 58–37–8(2)(a)(i), (b)(ii) (Supp.2010).[2]

¶ 5 Duhaime filed a motion to suppress the marijuana evidence, arguing that the patrolman lacked reasonable suspicion to stop him for an equipment or traffic violation and that the detention was longer than necessary to effectuate the purpose of the stop. The trial court found that the patrolman's testimony regarding the license plate light was credible, that no contrary testimony was presented, and that it was unclear from the video whether the light was functioning. The trial court specifically found that inconsistencies in the patrolman's testimony were the result of exaggeration, miscommunication, or failure of recollection, not fabrication.[3] The trial court further found that Duhaime's nervousness, combined with the luggage in the back seat and the four cell phones, gave the patrolman sufficient reasonable suspicion to justify his extensive questioning concerning Duhaime's travel plans. Combined with what the patrolman felt were suspicious answers given by Duhaime, these factors, the trial court concluded, gave the patrolman reasonable suspicion to detain Duhaime until the drug detection dog arrived. The trial court therefore denied Duhaime's motion to suppress. Duhaime pleaded guilty to the third degree felony but reserved his right to appeal the trial court's denial of the motion to suppress. *See generally State v. Sery*, 758 P.2d 935, 939 (Utah Ct.App.1988). The trial court signed a certificate of probable cause stating that the case raised substantial issues of law for appeal.

## ISSUE AND STANDARDS OF REVIEW

¶ 6 Duhaime argues that the trial court should have granted his motion to suppress on Fourth Amendment Grounds, *see* U.S. Const. amend. IV, because the patrolman did not have reasonable suspicion to pull

---

**2.** He was also charged with illegal possession of diazepam, a class B misdemeanor, *see* Utah Code Ann. § 58–37–8(2)(a)(i), (d) (Supp.2010), and with an equipment violation for the broken light, a class C misdemeanor, *see* Utah Code Ann. § 41–6a–1604(2)(c) (2010).

**3.** The trial court ruled that the patrolman had misinterpreted the law concerning Duhaime's lane change and that the lane change was not a traffic violation. However, because the trial court concluded that the equipment violation provided a valid basis for the stop, it did not consider the patrolman's misinterpretation to have affected the validity of the stop.

him over, the patrolman's questioning exceeded the permissible scope and duration of the traffic stop, and the patrolman lacked reasonable suspicion to detain him to await the arrival of a drug detection dog. "When reviewing a district court's denial of a motion to suppress, the appellate court disturbs the district court's findings of fact only when they are clearly erroneous" but "reviews the district court's legal conclusions for correctness." *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650. Furthermore, we give no deference to the trial court's "application of law to the underlying factual findings in search and seizure cases." *State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.

## ANALYSIS

¶ 7 The Fourth Amendment to the United States Constitution prohibits "unreasonable search and seizures." U.S. Const. amend. IV. " '[S]topping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the [Fourth and Fourteenth] Amendments,' " *State v. Case*, 884 P.2d 1274, 1276 (Utah Ct.App.1994) (alterations in original) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)), and requires at least a reasonable, articulable suspicion of criminal activity, *see State v. Johnson*, 805 P.2d 761, 763 (Utah 1991). A reasonable investigatory stop must be "justified at its inception," and "the detention following the stop [must be] reasonably related in scope to the circumstances that justified the interference in the first place." *State v. Applegate*, 2008 UT 63, ¶ 9, 194 P.3d 925 (internal quotation marks omitted). Reasonableness in the Fourth Amendment context " 'is measured in objective terms by examining the totality of the circumstances.' " *Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). Unless, "during the scope of the traffic stop, the officer forms new reasonable articulable suspicion of criminal activity ...,  the officer must allow the seized person to depart once the purpose of the stop has concluded." *Id.* ¶ 13 (citation omitted).

¶ 8 Duhaime argues that the stop in this case was neither justified at its inception nor

appropriately limited in scope and duration. First, he challenges the trial court's finding that Duhaime's rear license plate was not illuminated, arguing that this fact was contradicted by other evidence and that the patrolman's testimony lacked credibility. Second, he argues that even if the patrolman was justified in stopping him, the patrolman's questioning exceeded the reasonable scope of the stop. Third, he argues that the patrolman lacked reasonable suspicion to detain Duhaime while waiting for the drug detection dog.

### I. Justification for the Stop

¶ 9 "[A] police officer is constitutionally justified in stopping a vehicle if the stop is incident to ... [a]n observed traffic violation[, which] gives the officer[,] at the least, probable cause to believe the citizen ha[s] committed a traffic offense," or if "the officer has reasonable articulable suspicion that the driver is committing a traffic offense." *State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (citations and internal quotation marks omitted). In this case, the patrolman claimed that Duhaime's license plate was not properly illuminated, in violation of Utah Code section 41–6a–1604(2)(c), *see* Utah Code Ann. § 41–6a–1604(2)(c) (2010). The trial court made a specific finding that the patrolman's testimony regarding the license plate was credible. Although the court acknowledged some inconsistencies between the video and the patrolman's testimony, it determined that those inconsistencies were not the result of fabrication by the patrolman and did not affect his credibility.

¶ 10 "[A] reviewing court may not reassess credibility or reweigh the evidence" unless the testimony is "inherently improbable." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993) (internal quotation marks omitted). "[W]itness testimony is inherently improbable ... if it is (1) physically impossible or (2) apparently false." *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. Duhaime argues that the license plate is clearly visible in the video and that the light could not have been broken. While the license plate does appear to be visible in the video, we agree with the trial court that it is not discernible

from the video whether the light was broken. We also observe that when the patrolman pointed out the broken light to Duhaime, he acknowledged the broken light, telling the patrolman, "I'll get that taken care of." Thus, we have no basis for concluding that the patrolman's testimony was either physically impossible or apparently false, and we cannot reassess the trial court's finding regarding the patrolman's credibility. Given that finding, the fact that the video of the license plate was inconclusive, and the fact that no other evidence was offered to contradict the patrolman's testimony, we cannot say that the trial court clearly erred in finding that the license plate was not properly illuminated or in concluding that the patrolman therefore had probable cause to stop Duhaime.

## II. Police Questioning

▉ ¶ 11 Duhaime next contends that the patrolman's questioning unreasonably exceeded the scope of the stop. A lawful traffic stop must be "reasonably related in scope to the traffic violation which justified it in the first place" and " 'last no longer than is necessary to effectuate the purpose of the stop.' " *Lopez*, 873 P.2d at 1132 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Actions within the scope of a routine traffic stop may include a request for a driver license and vehicle registration, a computer check for outstanding warrants, and the issuance of a citation. *See id.* Several of the federal circuit courts have held that "questions relating to a driver's travel plans [also] ordinarily fall within the scope of a traffic stop." *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir.2001); *accord United States v. Givan*, 320 F.3d 452, 459 (3d Cir.2003); *see also, e.g., United States v. Gregory*, 302 F.3d 805, 809 (8th Cir.2002). However, we are persuaded by the reasoning of Wayne R. LaFave's Search and Seizure treatise, which convincingly observes that there are many circumstances where questions about travel plans exceed the scope of a traffic stop because "[t]he objective [of such questions] is not to

gain some insight into the traffic infraction providing the legal basis for the stop, but to uncover inconsistent, evasive or false assertions that can contribute to reasonable suspicion or probable cause regarding drugs." [4] 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.3(d), at 392–95 (4th ed. 2004); *see also Lopez*, 873 P.2d at 1132 ("[The] scope of the detention must be strictly tied to and justified by the circumstances which rendered its initiation permissible.... Investigative questioning that further detains the driver must be supported by reasonable suspicion of more serious criminal activity." (citations and internal quotation marks omitted)).

▉ ¶ 12 Nevertheless, we observe that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100–01, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)); *see also United States v. Everett*, 601 F.3d 484, 493–94 (6th Cir.2010) (rejecting a rule that would strictly prohibit any questioning that prolongs a stop by the least degree in favor of a totality of the circumstances analysis examining the nature of the questioning and the overall duration of the stop); *United States v. Childs*, 277 F.3d 947, 949 (7th Cir.2002) ("[Q]uestions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable...."). The patrolman spent approximately eighteen seconds questioning Duhaime before explaining the purpose of the stop and proceeding with the business of the stop. He then continued to ask Duhaime about his travel plans while asking for, waiting for, and examining Duhaime's driver license and rental agreement. *See generally Everett*, 601 F.3d at 489–90 (interpreting the Supreme Court's holdings in *Muehler* and *Johnson* to hold that police may ask any questions, whether or not relat-

---

4. The point is well-illustrated by the facts of this case. Whether Duhaime was headed to Evanston, Wyoming, or Baltimore, Maryland, would have no bearing on whether his rear license plate light was working properly.

ed to the purpose of the stop, if the questioning is conducted while the police are carrying out the tasks necessary for the stop). The State contends that this questioning did not "measurably extend the duration of the stop," *see Johnson*, 129 S.Ct. at 788. However, we need not reach a decision on that question because we determine that the totality of the circumstances did not give the patrolman reasonable suspicion to detain Duhaime to wait for the drug detection dog.

### III. Detention to Wait for Drug Detection Dog

¶ 13 The trial court found that the presence of four cell phones, the fact that the luggage was in the back seat rather than the trunk, Duhaime's nervousness, and the implausibility of Duhaime's travel plans, combined, provided the patrolman with reasonable suspicion of criminal activity—presumably, transportation of illegal drugs. The State further contends that the presence of fast food containers and coffee cups, the fact that Duhaime had both a map and a GPS, the fact that Duhaime was driving on Interstate 80, Duhaime's origin and destination, and the fact that Wife took a "couple of minutes" to wake up after the vehicle was stopped also suggested criminal activity. "[C]ourts cannot evaluate individual facts in isolation to determine whether each fact has an innocent explanation. Rather courts must look to the 'totality of the circumstances' to determine whether, taken together, the facts warranted further investigation by the police officer." *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (citation omitted). Nevertheless, even considered in their totality, these circumstances are not sufficient to support reasonable suspicion that illegal drugs were being transported.

¶ 14 "[T]he information an officer relies upon in making a seizure need not be illegal or describe illegal activity in order to give a law enforcement officer reasonable suspicion of criminal activity." *State v. Tetmyer*, 947 P.2d 1157, 1160 (Utah Ct.App. 1997) (internal quotation marks omitted). Moreover, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), and the fact that an individual observation is "readily susceptible to an innocent explanation [does not mean that it is] entitled to no weight," *id.* at 274, 122 S.Ct. 744 (internal quotation marks omitted). However, as the United States Supreme Court has noted, circumstances that in their totality "describe a very large category of presumably innocent travelers" cannot be deemed to give rise to reasonable suspicion. *Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (holding that three individually innocent factors combined with a single slightly suspicious factor could not support reasonable suspicion); *accord Tetmyer*, 947 P.2d at 1160. We will not automatically negate any factors, as factors that may be innocuous in one context may give rise to suspicious inferences in another. *Cf. Arvizu*, 534 U.S. at 276, 122 S.Ct. 744 ("We think it quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona)."). Nevertheless, "some factors are more probative than others," *id.* at 277, 122 S.Ct. 744, especially when they may be reasonably interpreted in a variety of ways, *cf. United States v. Sokolow*, 490 U.S. 1, 13–14, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (Marshall, J., dissenting) (questioning the reliability of drug courier profiles, observing that various cases interpret suspicious factors in a contradictory way and citing cases that found reasonable suspicion where suspects were first to deplane, were last to deplane, or deplaned in the middle; where suspects had one-way tickets or round-trip tickets; where suspects took a nonstop flight or changed planes; where suspects traveled alone or with a companion; and where suspects acted nervously or too calmly). Thus, we are not convinced that every factor cited by the patrolman has relevance in the context of this particular traffic stop. We also will not conclude that reasonable suspicion exists merely by virtue of the fact that an officer is able to articulate a large number of factors where

those factors, even combined, still evidence innocent behavior as readily as criminal behavior.

¶ 15 According to the patrolman, the most suspicious factor was Duhaime's travel plans. *See generally United States v. Simpson,* 609 F.3d 1140, 1148 (10th Cir.2010) ("Implausible travel plans can contribute to reasonable suspicion." (internal quotation marks omitted)). The patrolman in this case described Duhaime's travel plans as "very, very suspicious." Specifically, the patrolman thought it was suspicious that Duhaime mentioned several possible ultimate destinations, that Duhaime's claim that he and Wife wanted to enjoy the drive was inconsistent with the short amount of time they had to return the rental car, and that Duhaime's claim that he and Wife drove because it was less expensive than flying was not reasonable in light of the fact that they paid $1,200 for the rental car.[5] He also observed that Duhaime was "unsure of [answers to] simple questions," such as the purpose of the trip and the name of the family member he was visiting. "[V]ague, inconsistent or evasive answers with respect to travel plans [may be] supportive of reasonable suspicion." *Id.* at 1150. Nevertheless, "suspiciousness cannot be based simply on the fact that a person is making unusual travel plans, or plans that an officer would not have chosen to make." *Id.* at 1152. For the most part, Duhaime's travel plans were merely unusual, but not necessarily suspicious. *Cf. United States v. Salzano,* 158 F.3d 1107, 1111–12 (10th Cir.1998) (rejecting the government's argument that the uneconomical decision to rent an expensive motor home to travel across the country contributed to reasonable suspicion, emphasizing that "[s]imply because the officer would not have chosen a particular vehicle for travel does not make the choice indicative of criminal activity"). Nevertheless, "in conjunction with the other factors presented in this case, they are deserving of some weight." *Cf. Simpson,* 609 F.3d at 1151–52 (holding that the fact that the defendant drove a long distance to spend one night at his destination and the fact that he gave evasive and inconsistent answers about his travel plans were of limit-

ed significance by themselves but supported reasonable suspicion when combined with other factors); *see also United States v. Santos,* 403 F.3d 1120, 1130–31 (10th Cir.2005) (holding that "vague, evasive, and inconsistent answers" concerning the length of defendant's trip and information about his family could contribute to reasonable suspicion (internal quotation marks omitted)).

¶ 16 The patrolman also claimed that the fact that Duhaime and Wife had four cell phones between them could contribute to reasonable suspicion, as it is unusual for an individual to carry more than one cell phone. Like the odd travel plans, this factor does not alone give rise to reasonable suspicion, but combined with other factors, it may make criminal activity more likely. *See United States v. Townsend,* 305 F.3d 537, 544 (6th Cir.2002).

¶ 17 The fact that Duhaime was traveling from Oakland to Chicago on Interstate 80, "a known drug trafficking corridor" according to the patrolman, is even less probative than the foregoing factors, *see United States v. White,* 584 F.3d 935, 951–52 (10th Cir.2009) ("Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, . . . the probativeness of a particular defendant's route is minimal."), *cert. denied,* ——— U.S. ———, 130 S.Ct. 1721, 176 L.Ed.2d 202 (2010); *but cf. State v. Poole,* 871 P.2d 531, 534 & n. 1 (Utah 1994) (listing an Interstate 15 route as a factor supporting probable cause, observing that Interstate 15 is "an established route for illegal drug trafficking" and "the most common route taken by drug smugglers in the Western Hemisphere"), as is the fact that Duhaime and Wife had their luggage on the back seat rather than in the trunk, *see State v. Slavin,* 944 S.W.2d 314, 320 (Mo.Ct.App.1997) (per curiam) (holding that the presence of luggage and fishing poles in the back seat rather than the trunk "was not relevant to the reasonable suspicion inquiry[, as i]t is common knowledge that many travelers will place some or all luggage in the back seat"); *Damato v. State,* 2003

---

5. There is nothing in the record to indicate that the patrolman knew at the time of the stop what the cost of two one-way plane tickets from Oakland to Chicago would have been.

WY 13, ¶ 25, 64 P.3d 700, ¶ 25 (Wyo.2003) (holding that the suspicion associated with luggage in the back seat "is virtually nonexistent" (internal quotation marks omitted)); *cf. United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir.1997) (finding "only the most minute significance in the fact that [defendant] had no luggage on the back seat"); *but see United States v. Orsolini*, 300 F.3d 724, 728–29 (6th Cir.2002) (holding that the district court erred by dismissing several factors, including the presence of luggage in the back seat rather than the trunk, instead of considering them as part of the totality of the circumstances). However, because these factors may, under some circumstances, be more common of drug traffickers than the average innocent traveler, they may have marginally enhanced the reasonableness of the patrolman's suspicion when considered as part of the totality of the circumstances.

¶ 18 Duhaime's nervousness and Wife's delay in waking, while potentially having some probative value in other contexts, have little, if any, significance in this case. Nervousness is entitled to significant weight only if it is "[e]xtreme and persistent" as demonstrated by objective facts rather than "an officer's naked assertion." *Simpson*, 609 F.3d at 1148; *see also State v. Sery*, 758 P.2d 935, 944–45 (Utah Ct.App.1988) (holding that nervousness is entitled to no weight "[i]f the officer cannot articulate the unusual mannerisms or actions by the defendant that led to a conclusion of nervousness"). Otherwise, "nervousness is of limited significance in determining whether reasonable suspicion exists" because it is common for innocent individuals as well as guilty ones "to exhibit signs of nervousness when confronted by a law enforcement officer" and because it is difficult for an officer who is not familiar with a person to evaluate whether they are "acting normally for them or nervously." *Simpson*, 609 F.3d at 1147–48 (internal quotation marks omitted); *see also State v. Dennis*, 2007 UT App 266, ¶ 12, 167 P.3d 528 (observing that Utah courts "have long downplayed [the] significance" of nervousness as a factor supporting reasonable suspicion). The patrolman testified, "Duhaime was very, very nervous in answering questions about his trip, his origination and his destination. . . .

He avoided eye contact when answering those simple questions." The patrolman further testified that Duhaime did not exhibit any nervous physical behavior such as shaking or sweating, but that "[i]t seemed like [Duhaime] had a frog in his throat and he had a hard time answering . . . questions." We have previously held that avoidance of eye contact, which is "consistent with innocent as well as criminal behavior," cannot support a reasonable suspicion of criminal behavior. *See State v. Robinson*, 797 P.2d 431, 436 (Utah Ct.App.1990). Further, the patrolman's determination of nervousness based on the fact that Duhaime "had a frog in his throat" is precisely the type of determination that an officer unfamiliar with a person is unqualified to make. Duhaime may simply have had a raspy voice or a cold. Apart from these two objective observations, which do not indicate an unusual degree of nervousness, we have only the patrolman's assertion that Duhaime was "very, very nervous." Because the patrolman's assessment of Duhaime's nervousness was purely subjective, "we decline to give much weight" to it. *See id.*

¶ 19 Similarly, the fact that Wife was slow to wake, while potentially relevant in some cases, *see, e.g., United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir.1996) (holding that passenger's "feigning grogginess in an attempt to avoid answering questions" was a factor that could contribute to reasonable suspicion), is of limited significance here because there is nothing in the patrolman's testimony to explain how this factor was suggestive of criminal activity, let alone drug trafficking in particular. It is unclear whether he believed that Wife was under the influence of drugs, that she was feigning sleep to avoid answering questions, or something else, so it is difficult to determine how this factor contributed to the formation of the patrolman's reasonable suspicion. *See generally State v. Warren*, 2003 UT 36, ¶ 20, 78 P.3d 590 (observing that in the context of a *Terry* frisk, the United States Supreme Court has evaluated "the officer's subjective interpretation of the facts as part of the totality of the circumstances"). The patrolman merely noted that he "thought [it] was odd" that Wife

would not wake up immediately when he was shining a flashlight in the car and the cold January air was coming in through the window. Any number of behaviors might be considered "odd" while not being suggestive of criminal activity, *cf. Simpson*, 609 F.3d at 1149 (holding that travel plans that are merely "unusual or strange" or that "indicate[ ] a choice that the typical person ... would not make" are insufficient to support reasonable suspicion); *see generally State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 ("[A]n 'inchoate and unparticularized suspicion or "hunch," ' is insufficient to establish reasonable suspicion." (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))), and under the circumstances of this case, it is unclear how Wife's delay in waking contributed to the patrolman's reasonable suspicion of criminal activity. Furthermore, just as some individuals may be naturally more nervous than others, some individuals sleep more deeply than others, and we hesitate to credit the patrolman's assessment of what a person he has never met ought to be able to sleep through. *Cf. Simpson*, 609 F.3d at 1147–48 (noting that it is difficult for an officer who is not familiar with a person to evaluate whether they are "acting normally for them or nervously").

¶ 20 Finally, the presence of fast food containers, coffee, a GPS, and a map are so ubiquitous among contemporary travelers that we hesitate to attach any significance to them and can imagine very few circumstances where such factors will have any probative value. *See State v. Richards*, 2009 UT App 397, ¶ 10 n. 4, 224 P.3d 733 ("The possession of open maps and the vestiges of fast-food meals describes a very large category of presumably innocent travelers, and any suspicion associated with these items is virtually nonexistent." (citing *United States v. Wood*, 106 F.3d 942, 947 (10th Cir.1997))); *cf. United States v. Simpson*, 609 F.3d 1140, 1152 (10th Cir.2010) (observing that the presence of butane lighters, a radar detector, and energy pills were "of little or no significance" as such items could likely be found "in the vehicle of any innocent traveler"). These items are just as likely to be present in the vehicles of innocent drivers as the vehicles of drug traffickers.

¶ 21 When taken together with the reason for the initial stop, we conclude that the circumstances, considered in their totality, especially in the context of the patrolman's subjective interpretation, failed to meet the reasonable suspicion threshold. As a whole, the patrolman's reasonable suspicion was based entirely on his subjective assessment of what cross-country travelers should or should not do. But individuals are not so predictable, and travelers will commonly act in a variety of different and even unusual ways. The fact that a traveler's behavior does not conform to an officer's personal habits or his personal assessment of normal traveling patterns and behavior does not necessarily mean that the traveler is engaging in criminal activity. *See Simpson*, 609 F.3d at 1152. Ultimately, the factors cited by the State, even considered in their totality, "describe a very large category of presumably innocent travelers," *see Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), and do not support reasonable suspicion. Thus, the patrolman's actions in prolonging the detention of Duhaime to wait for a drug detection dog violated his Fourth Amendment rights.

## CONCLUSION

¶ 22 The trial court did not err in concluding that the stop in this case was justified at its inception, and the patrolman's testimony about the stop was not so implausible as to justify our reassessing his credibility on appeal. However, the totality of the circumstances did not support a reasonable suspicion that Duhaime was transporting drugs, and Duhaime was illegally seized when he was detained to await the drug detection dog. We therefore reverse the trial court's denial of Duhaime's motion to suppress, and we remand the case for proceedings consistent with this opinion.

¶ 23 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge, and GREGORY K. ORME, Judge.