**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 11, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ADAM JOSEPH TRESTYN,

    Defendant-Appellant.

No. 10-8029

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CRYSTAL KAY HERREN,

    Defendant-Appellant.

No. 10-8046

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 09-CR-216-ABJ)**

---

Thomas A. Fleener of Fleener & Vang, LLC, Laramie, Wyoming, for Defendant-Appellant Adam Joseph Trestyn.

James Alfred Bustamante, San Francisco, California, for Defendant-Appellant Crystal Kay Herren.

Eric J. Heimann, Special Assistant United States Attorney (Christopher A. Crofts, United States Attorney; Steven K. Sharpe, Assistant United States Attorney with him on the brief), Office of the United States Attorney, Cheyenne, Wyoming for the Plaintiff-Appellee.

Before **KELLY, TACHA,** and **EBEL,** Circuit Judges.

**EBEL**, Circuit Judge.

In these consolidated direct criminal appeals, Defendants–Appellants Adam Trestyn and Crystal Herren challenge the district court proceedings that led to their guilty pleas for possession with intent to distribute MDMA and aiding and abetting: First, Herren argues that the district court denied her Sixth Amendment right to counsel of choice when it refused to continue a suppression hearing. Second, Trestyn and Herren raise ineffective assistance of counsel claims. Third, Trestyn and Herren challenge the district court's refusal to suppress illicit drugs discovered in their minivan during a traffic stop. And fourth, Trestyn challenges the sentence imposed on him.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we conclude as follows: First, the district court did not deny Herren her Sixth Amendment right to counsel of choice when it refused to continue the suppression hearing. Second, because this is a direct appeal, we dismiss Trestyn's and Herren's ineffective assistance of counsel claims without prejudice. Third, the district court erred in denying Trestyn's and Herren's

2

motions to suppress. Based on that error, we reverse and vacate Trestyn's and Herren's convictions and sentences, and, thus, we need not address Trestyn's challenge to his sentence.[1]

## I. BACKGROUND

### A. Factual History

On July 1, 2009, at approximately 5:30 p.m., Wyoming Highway Patrol Trooper Nykun was patrolling a section of Interstate 80, west of Cheyenne, Wyoming. Trooper Nykun noticed a silver Honda Odyssey minivan traveling eastbound displaying a rear California license plate but no front license plate. Trooper Nykun knew that California law requires vehicles to display both front and rear license plates, see Cal. Veh. Code § 5200 (West 2003), so he initiated a traffic stop.

Trooper Nykun approached the minivan on foot and informed Trestyn, who was driving, that he stopped the vehicle for a license plate violation. Trestyn explained that he and Herren purchased the car in California and were travelling back to Ohio. Herren, seated in the passenger seat, explained that the seller did not have a front license plate for the minivan. Trestyn then provided documents related to the purchase. Trooper Nykun asked Trestyn to provide a driver's license and to come to his patrol car. So Trestyn exited the minivan, gave Trooper Nykun a New York driver's license, and walked to the patrol car.

---

[1] We also grant Herren's motion to file volume III of her appendix under seal.

3

At this point, Trestyn, seated in the front passenger seat of the patrol car with the door open, explained that he and Herren found the minivan on the Internet and flew to California to purchase it for $9,000. Trooper Nykun found the story unusual because of the state of Ohio's economy at the time; specifically, he found it unusual that Trestyn and Herren would "fly all the way out to California to purchase an older van that you could probably get in Ohio for either the same price or cheaper." (Aplt. Trestyn App., vol. III at 31–32.)

After Trestyn described how the two purchased the minivan, Trooper Nykun asked Trestyn for proof of insurance. Trestyn responded that it was in the minivan, so Trooper Nykun and Trestyn exited the patrol car. Trooper Nykun approached Herren at the front passenger's side window of the minivan. There Trooper Nykun asked Herren for proof of insurance, and she provided an insurance card with the name "Crystal K. Herren." Herren explained, just as Trestyn did, that she and Trestyn flew from Ohio to California to purchase the minivan for $9,000. Trooper Nykun asked Herren if the minivan was in her name, and she responded that it was. At this point, Trooper Nykun asked Trestyn to go sit in the minivan, and Trooper Nykun returned to his patrol car.

At 5:38 p.m., seated back in his patrol car, Trooper Nykun radioed Trooper Germain and requested that Trooper Germain come to his location to perform a canine free air sniff. Trooper Germain is a certified narcotics-detection-canine handler, and his dog, Bonnie, was certified to detect the odors of marijuana, methamphetamine, cocaine, and heroin by the California Narcotic Canine Association. Trooper Germain responded

4

that he would be en route to Trooper Nykun's location in about five minutes.

Then, Trooper Nykun contacted dispatch to run a driver's license check on Trestyn in Ohio, California, and New York. While waiting for the driver's license check to be completed, Trooper Nykun began filling out the paperwork for a warning for the missing front license plate and reviewed the purchase agreement for the minivan provided by Trestyn and Herren. Shortly thereafter, dispatch asked Trooper Nykun for Trestyn's middle name, which was not listed on his New York driver's license but which was needed to complete the driver's license check with Ohio. Trooper Nykun could not find Trestyn's middle name in the paperwork that he had, so Trooper Nykun once again approached the minivan. When Trooper Nykun asked Trestyn for his middle name, he also asked Herren for her driver's license. At this point, Herren provided an Ohio driver's license.

At 5:41 p.m., Trooper Nykun returned to his patrol car where dispatch explained that Ohio and California reported expired identifications for Trestyn while New York reported a valid license. Trooper Nykun then asked dispatch to run a driver's license check on Herren and a vehicle identification number (VIN) check on the minivan. Trooper Nykun waited in his patrol car for Trooper Germain to arrive as those checks were being performed.

Once Trooper Germain arrived at the scene, his canine, Bonnie, alerted at the minivan signaling to the troopers that she detected the odor of a controlled substance. Eventually, the troopers recovered four bundles of white powder wrapped in grey duct

5

tape and dryer sheets from underneath a plastic speaker cover.  The troopers arrested

Trestyn and Herren, and a more thorough search of the minivan at the Cheyenne Drug

Enforcement Agency/Division of Criminal Investigation office revealed four more

packages of white powder.  Laboratory tests confirmed that the white powder was

MDMA, also known as ecstasy.

### B. Procedural History

A grand jury indicted Trestyn and Herren on July 23, 2009, with two drug

trafficking counts.  On September 2, 2009, Trestyn filed a motion to suppress the

evidence seized as a result of the search of the minivan.  The district court scheduled a

hearing for September 29, 2009, to consider the motion.  But on September 25, 2009,

Herren filed a similar motion to suppress, and so the district court rescheduled the

hearing for October 2, 2009.

On October 1, 2009, the day before the suppression hearing, Herren filed two

additional motions.  First, Herren filed a motion and affidavit for the admission of

California attorney James Bustamante pro hac vice as Herren's counsel.  Second, Herren

filed a motion to continue the suppression hearing in order to give Bustamante adequate

time to prepare for the hearing.

At the beginning of the suppression hearing, Herren's counsel, Mr. Bustos, asked

the district court to continue the hearing so that Bustamante, who was not present, could

appear on behalf of Herren. Judge Brimmer orally denied the motion during the

following exchange:

6

Mr. Bustos: If I may be able to address another matter first, Your Honor.

The Court: Well, with regard to your motion to continue, we just can't do that.

Mr. Bustos: Well, if I may, Your Honor, the situation is that my client, Miss Herren, she's adamant that she wants to be represented by different counsel in this matter. It is not that she's negative towards me, and she will say that, it is just that she prefers another attorney.

The Court: We will hear that after the motion is heard.

Mr. Bustos: And with that said, then, I would then move to withdraw Miss Herren's motion at this time, Your Honor.

The Court: Well, we don't do that. You've got adequate counsel at the moment. You're in good hands and couldn't be in better hands, and so we will go ahead with our motion.

The Defendant: Your Honor, I don't want to go ahead with the motion. I have a right to the counsel of my choice, and I have retained Mr. James Bustamante.

The Court: I'm sorry, we're going to go ahead with the motion. I happen to be running the court, not you, Dear.

(Aplt. Herren App., vol. II at 240–41.)

After denying the motion to continue, Judge Brimmer first heard testimony from Trooper Nykun. Trooper Nykun detailed the traffic stop of Trestyn and Herren and the subsequent discovery of the MDMA in the minivan. Then, before Bustos began cross-examining Trooper Nykun, Herren once again addressed the court to explain that she wanted Bustamante to represent her. Judge Brimmer responded as follows:

7

Mr. Bustos has been appointed as your attorney by the Court.[2] Your attorney that you would like, Bustamante, isn't here. If he were here, I would admit him and let him proceed. But he hasn't seen fit to come. This hearing was well-known to everyone beforehand. He could have arrived and he didn't. Please sit down. Mr. Bustos can ask questions in your behalf.

(Id. at 283.) After that, Bustos moved to withdraw as Herren's attorney, but Judge Brimmer also denied that motion. Bustos went on to cross-examine Trooper Nykun. The Government also called Trooper Germain, who testified about the details of his involvement in the search of the minivan. Both Trestyn's and Herren's attorneys cross-examined Trooper Germain, but neither presented any witnesses or evidence.

After hearing the testimony of Troopers Nykun and Germain and receiving the Government's exhibits, Judge Brimmer orally denied both motions to suppress. The district court also issued a written order to that effect on October 8, 2009.

On December 11, 2009, Herren, through her new counsel, Bustamante, filed a motion for reconsideration of her motion to suppress. A week later, Trestyn joined the motion. On December 21, 2009, the Government filed its response to the motion for reconsideration, and Trestyn and Herren's case was reassigned from Judge Brimmer to Judge Johnson.

Judge Johnson held an evidentiary hearing on the motion for reconsideration on January 11, 2010. At that hearing, the court heard the testimony of Stephen Nicely, a

---

[2] The record reflects that Bustos was retained, not appointed counsel. But this misstatement does not affect our analysis of the issues in this case.

8

narcotics-detection-dog expert for the defendants. Then, the court heard the testimony of Kenneth Wallentine, a narcotics-detection-dog expert for the Government. But Judge Johnson refused to allow Trestyn and Herren to recall Troopers Nykun or Germain at this hearing.

The district court denied the motion for reconsideration in a written order on January 21, 2010. In that order, the court rejected three arguments for reconsideration. First, Trestyn and Herren argued that, although they conceded the validity of the initial traffic stop in their motions to suppress, the initial traffic stop was not based upon any violation of Wyoming law. But the court concluded that both Trestyn and Herren waived that argument when they conceded the legality of the initial stop in their motions to suppress. Further, the district court determined that even if the issue had not been waived, the initial traffic stop was lawful because Wyoming troopers have the authority to stop a vehicle with license plates that are not properly displayed according to the laws of the state in which the vehicle is registered.

Second, Trestyn and Herren argued that Trooper Nykun did not have reasonable suspicion to prolong their detention while he completed a background check on Herren. But the district court concluded otherwise, finding that a trooper is allowed to run background checks on all occupants of a vehicle during a routine traffic stop. Further, the district court emphasized that Herren, not Trestyn, was the registered owner of the minivan, and, therefore, Trooper Nykun acted appropriately in determining the owner of the vehicle.

9

Finally, Trestyn and Herren argued that the testimony of Nicely proved that Bonnie was not a properly trained, reliable narcotics-detection dog.  The court rejected this argument as well.  The district court found that Bonnie was a reliable narcotics-detection dog based on her certification and Trooper Germain's ongoing training with her.  The court also noted that from watching the video, it noticed a change in Bonnie's behavior during her deployment around the minivan.

After the denial of the motion for reconsideration, both Trestyn and Herren entered into conditional plea agreements and pled guilty to the second count in the indictment—possession with intent to distribute MDMA and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2.  The district court sentenced Trestyn to 110 months' imprisonment and Herren to 70 months' imprisonment. Both Trestyn and Herren timely appealed.

## II. DISCUSSION

### A. Sixth Amendment Right to Counsel of Choice Claim

First, Herren argues that the district court deprived her of counsel of choice, guaranteed by the Sixth Amendment, when it refused to grant her motion to continue the suppression hearing.  See Wheat v. United States, 486 U.S. 153, 159 (1988) (describing the Sixth Amendment right of a defendant who does not require appointed counsel to choose who will represent him).  Herren bases her argument on the Supreme Court's decision in United States v. Gonzalez-Lopez, 548 U.S. 140 (2006).  In Gonzales-Lopez, the Supreme Court held that when a court wrongly denies a defendant counsel of choice,

10

the error is structural and, thus, not subject to harmless error analysis. Id. at 150.

As the Government explains, however, Gonzalez-Lopez does not address the particular question that Herren raises—whether the district court erred by not granting a continuance so that Bustamante could be admitted pro hac vice to represent her. Concerning that question, this Court has offered previous guidance.

In United States v. Flanders, we observed that, in reviewing the district court's denial of a continuance to allow the defendant to obtain new counsel, the court must "balanc[e] the defendant's constitutional right to retain counsel of . . . choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice." 491 F.3d 1197, 1216 (10th Cir. 2007) (internal quotation marks omitted).

> In striking that balance, we consider whether: 1) the continuance would inconvenience witnesses, the court, counsel, or the parties; 2) other continuances have been granted; 3) legitimate reasons warrant a delay; 4) the defendant's actions contributed to the delay; 5) other competent counsel is prepared to try the case; 6) rejecting the request would materially prejudice or substantially harm the defendant's case; 7) the case is complex; and 8) any other case-specific factors necessitate or weigh against further delay.

Id. We review the district court's decision for an abuse of discretion. Id.

In Flanders, a defendant filed a fourth motion to continue his trial after receiving funds that would enable him to retain an attorney. Id. at 1215. The district court denied the motion for a continuance because of the "age of the case" and the "substantial likelihood that [the] Defendant would make an eleventh-hour plea for another

11

continuance." Id. (internal quotation marks omitted).  In concluding that the district court

did not abuse its discretion, this Court explained,

> Due to the scheduling burdens of the district courts, assembling the witnesses, lawyers, and jurors at the same place at the same time necessitates that broad discretion . . . be granted [to] trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.

Id. at 1216 (internal quotation marks omitted).

We conclude that the district court did not abuse its discretion by denying

Herren's motion for a continuance.  First, Herren waited until the day before the

suppression hearing to file the motion for continuance.  As a result, just as in Flanders, a

continuance would have inconvenienced witnesses, the court, counsel, and the parties.

Second, Herren failed to establish legitimate reasons that would warrant a delay.  While

Herren explained that she wanted the continuance in order to retain Bustamante as her

attorney, she did not offer a reason for why she waited until a day before the scheduled

suppression hearing to ask for the continuance.  Three months passed between the time of

Herren's arrest and the hearing, during which she could have retained Bustamante instead

of waiting until one day before the suppression hearing.  Finally, Bustos was prepared to

represent Herren at the suppression hearing.  Bustos cross-examined the Government's

witnesses at the hearing and gave a closing argument.  This shows that other competent

12

counsel was available to represent Herren.[3]

We cannot conclude that this was an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. Therefore, the district court did not abuse its discretion, and the denial of Herren's motion to continue the suppression hearing did not violate her Sixth Amendment right to counsel of choice.[4]

### B. Sixth Amendment Ineffective Assistance of Counsel Claims

Next, both Trestyn and Herren argue that their right to effective assistance of counsel was violated because of their attorneys' failure to challenge the initial traffic stop in the suppression motions and failure to call an expert to challenge the reliability of the narcotics-detection dog during the suppression hearing. But it is well established that ineffective assistance of counsel claims should generally be brought in collateral proceedings, not on direct criminal appeal. E.g., Massaro v. United States, 538 U.S. 500, 504–05 (2003); United States v. Calderon, 428 F.3d 928, 931 (10th Cir. 2005). The

---

[3] Herren impliedly questions Bustos's competence by pointing out that he was indefinitely suspended from the Tenth Circuit bar and censured by the Wyoming bar for failing to file a brief with this Court on behalf of his client in November of 2009. See Bd. of Prof'l Responsibility, Wyo. State Bar v. Jose Delaluz Bustos, 224 P.3d 873, 875 (Wyo. 2010). But that disciplinary action is unrelated to Bustos's performance in this case, and, while making no conclusion on any ineffective assistance of counsel claims, we see no evidence on the record before us indicating that Bustos should not be considered other competent counsel. Further, Herren's general satisfaction with Bustos is evidenced by the fact that he was retained by Herren as local counsel even after Bustamante came in as her primary attorney.

[4] We also observe that Judge Johnson held a second evidentiary hearing on the motion for reconsideration of the denial of the motions to suppress, and at that second evidentiary hearing, Herren was represented by Bustamante, her attorney of choice.

13

Supreme Court explained the rationale for this rule as follows:

> In light of the way our system has developed, in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose.

Massaro, 538 U.S. at 504–05. Therefore, when brought on direct appeal, ineffective assistance of counsel claims are "'presumptively dismissible, and virtually all will be dismissed.'" Calderon, 428 F.3d at 931 (quoting United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc)). We recognize a narrow exception for the "rare claims which are fully developed in the record [and allow such claims to] be brought either on direct appeal or in collateral proceedings." Galloway, 56 F.3d at 1242.

Both Trestyn and Herren argue that the factual record has been fully developed and, therefore, this Court should reach the merits of the ineffective assistance of counsel claims on direct appeal. But this case does not resemble the few cases in which we have applied this narrow exception. Cf. United States v. Hamilton, 510 F.3d 1209, 1212–13 (10th Cir. 2007) (hearing an ineffective assistance of counsel claim on direct appeal because the district court held a hearing to determine whether to withdraw a defendant's guilty plea based on ineffective assistance of counsel); United States v. Carr, 80 F.3d 413, 416 n.3 (10th Cir. 1996) (hearing an ineffective assistance of counsel claim on direct appeal because the defendant moved below to withdraw his guilty plea based on an allegation of ineffective assistance of counsel and the district court held a lengthy hearing

14

on the ineffective assistance issue). Neither Trestyn nor Herren asserted ineffective assistance of counsel claims in the district court. Therefore, the district court did not hold a hearing, hear testimony, or weigh the ineffective assistance question before the case arrived to us on direct criminal appeal. The district court never had an opportunity to consider those claims, much less develop a record on the issue. The record before us is insufficient to enable meaningful appellate review of these claims, and, therefore, we dismiss these claims without prejudice.

## C. Fourth Amendment Claims

Trestyn and Herren next challenge the district court's denial of their motions to suppress the evidence seized during the search of the minivan. When reviewing a denial of a motion to suppress, this Court accepts the district court's factual findings, unless they are clearly erroneous, and views the evidence in the light most favorable to the government. United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998). While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo. United States v. White, 584 F.3d 935, 944 (10th Cir. 2009).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention

15

quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A routine traffic stop, however, is more analogous to an investigative detention than a custodial arrest. United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995). We, therefore, analyze such stops under the principles developed for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). Thus, to determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," then second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Once an officer discovers that a traffic violation has not occurred, however, the law requires the officer to allow the driver to proceed without further delay. United States v. McSwain, 29 F.3d 558, 561–62 (10th Cir. 1994).

### a. Whether the Traffic Stop Was Justified at Its Inception

Turning first to whether this stop was justified at its inception, we conclude that Trestyn and Herren waived the argument that the traffic stop was not justified at its inception. Both Trestyn and Herren conceded in their motions to suppress that the traffic stop initiated by Trooper Nykun was justified at its inception because of the minivan's failure to display a front license plate. (See Aplt. Trestyn App., vol. I at 29 ("The defense agrees that Trooper Nykun had reasonable cause to stop Mr. Trestyn and investigate his missing license plate."); Aplt. Herren App., vol. I at 44 ("The defense agrees that Trooper Nykun had reasonable cause to stop the van and investigate its missing license plate.").)

16

Based on that concession, Judge Brimmer did not address this first part of the Terry inquiry when he denied the motions to suppress.

In their motion for reconsideration, Trestyn and Herren argued for the first time that the traffic stop was not justified at its inception. Trestyn and Herren asserted that Wyoming law does not require out-of-state vehicles passing through Wyoming to display two license plates. But as Judge Johnson correctly noted, "arguments raised for the first time in a motion for reconsideration are not properly before the [district] court and generally need not be addressed." United States v. Castillo-Garcia, 117 F.3d 1179, 1197 (10th Cir. 1997), overruled on other grounds by United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002). Normally, when an argument is "not considered or ruled upon by the district court, we will not address it on appeal." Burnette v. Dresser Indus., Inc., 849 F.2d 1277, 1285 (10th Cir. 1988). Because this argument was not considered or ruled upon by the district court, we decline to address it on appeal. Therefore, we assume for the purposes of this appeal that the traffic stop was justified at its inception.

### b. Whether the Stop Was Reasonably Related in Duration and Scope to the Circumstances that Justified the Stop in the First Place

We next turn to the question of whether the stop was reasonably related in scope to the circumstances that justified the interference in the first place and conclude that it was not. "An officer may not extend a traffic stop beyond a reasonable duration necessary to accomplish the purpose of the stop unless the driver consents to further

17

questioning or the officer has reasonable suspicion to believe other criminal activity is afoot." United States v. Rice, 483 F.3d 1079, 1083–84 (10th Cir. 2007).

In this case, Trooper Nykun initiated the traffic stop of the minivan for the sole purpose of determining whether the minivan violated Wyoming Statute section 31-2-201(d)(vi), which requires vehicles traveling in Wyoming but registered in another state to display either registration numbers or license plates in accordance with that state's laws.[5] Wyo. Stat. § 31-2-201(d)(vi) (2008). California law requires that "[e]very license plate shall have displayed upon it the registration number assigned to the vehicle for which it is issued, together with the word 'California' or the abbreviation 'Cal.' And the year number for which it issued." Cal. Veh. Code § 4851 (West 2000).

---

[5] The full text of this provision read as follows:

> (a) Every owner of a vehicle shall apply for registration of and license plates for the vehicle [in Wyoming] . . . .
> . . .
> (d) The following vehicles are exempt from the provisions of this section:
> . . .
>> (vi) Vehicles owned by a nonresident, validly registered in another state or country, displaying registration numbers or plates in accordance with the laws of that state or country and:
>>
>>> (A) Not operated for gain or profit in Wyoming nor used for transportation to or from employment in Wyoming; and
>>>
>>> (B) Not owned or operated by a person employed in this state.

Wyo. Stat. § 31-2-201(d)(vi) (2008). Subsequent amendments to this statute eliminated this provision. See Wyo. Stat. § 31-2-201 (2009). But because those amendments occurred after the traffic stop at issue, the amendments do not affect our resolution of this case.

18

Trestyn and Herren argue that they did not violate Wyoming Statute section 31-2-201(d)(vi) because the minivan displayed a valid registration number. We agree. Once Trooper Nykun approached the minivan on foot, he reasonably could have observed the registration number on the minivan's license plate. At that point, Trooper Nykun should have known that Trestyn and Herren did not violate section 31-2-201(d)(vi) because the California registration number was displayed even though the front license plate was not. Therefore, the continued detention of Trestyn and Herren exceeded the scope of the stop's underlying justification.

We find our cases dealing with traffic stops of vehicles displaying temporary registration stickers analogous to the situation presented here. In United States v. McSwain, a state trooper initiated a traffic stop of a vehicle because he could not read the expiration date on a temporary registration sticker posted in the rear window as it appeared to be covered with reflective tape. 29 F.3d 558, 560–61 (10th Cir. 1994). As the trooper approached the vehicle on foot, he verified that the temporary registration sticker in the rear window was valid and had not expired. Id. at 561. Therefore, this Court held that the trooper's "further detention of the vehicle to question [the defendant] about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification." Id.

Similarly, in United States v. Edgerton, a state trooper initiated a traffic stop of a vehicle because he could not read the temporary registration tag in the dark. 438 F.3d 1043, 1045 (10th Cir. 2006). "[T]he tag was illegible not due to any material within [the]

19

Defendant's ability to control, but due to external conditions." Id. at 1050. Based on that, this Court held that "[o]nce [the trooper] was able to read the [temporary registration] tag and deem it unremarkable, any suspicion that [the] defendant had violated [the Kansas statute concerning the display of license plates] dissipated . . . [and the trooper], as a matter of courtesy, should have explained to [the] Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." Id. at 1051.

In United States v. Ledesma, a trooper initiated a traffic stop of a vehicle because the trooper could not see any visible license plate or registration tag. 447 F.3d 1307, 1309–10 (10th Cir. 2006). Unlike McSwain and Edgerton, as the trooper approached the vehicle on foot, he could "kind of see something" that resembled a registration tag in the rear window, but even at a distance of four to five feet the trooper could not see what state issued the tag because of the dark tinting of the rear window. Id. at 1310. Kansas law requires license plates or registration tags to be "in a place and position to be clearly visible." Id. And the vehicle in Ledesma displayed its registration tag in violation of that law. Id. Therefore, the trooper continued to have an objectively reasonable articulable suspicion that a traffic violation had occurred or was still occurring after initially stopping the vehicle. Id. at 1313. Thus, this Court concluded that it was reasonable for the trooper to verify the defendant's license and registration, ask preliminary questions about the defendant's travel plans, and issue a written warning. Id. at 1314.

Turning to the facts of this case, it is uncontested that the rear license plate on the

20

minivan had a sticker affixed in the top, right corner, that included the registration number, "Cal.," and "2009," as required by § 4851. Once Trooper Nykun approached the minivan on foot from the rear, he reasonably could have observed the registration number. Trooper Nykun conducted this stop in the daylight, and nothing obstructed his view of the minivan's license plate. At that point, Trooper Nykun's reasonable suspicion that Trestyn and Herren violated § 31-2-201 would have dissipated, and the purpose of the stop was satisfied.

Trooper Nykun's further detention of the minivan to question Trestyn and Herren about their travel plans and to request their licenses exceeded the scope of the stop's underlying justification because, unlike Ledesma, he no longer had an objectively reasonable articulable suspicion that a traffic violation had occurred or was still occurring. Once Trooper Nykun observed or reasonably could have observed the registration number, McSwain and Edgerton instruct us that he should have explained to Trestyn and Herren the reason for the initial stop and then allowed them to continue on their way. The continued detention of Trestyn and Herren violated the Fourth Amendment, and, therefore, the district court's order denying the motion to suppress must be reversed.[6]

---

[6] Because we reverse the district court's order denying the motion to suppress and vacate Trestyn's and Herren's convictions and sentences, we need not address Trestyn's challenge to his sentence.

## III. CONCLUSION

For all of these reasons, we AFFIRM the district court's order denying Herren's motion to continue; DISMISS WITHOUT PREJUDICE Trestyn's and Herren's ineffective assistance of counsel claims; REVERSE the district court's order denying Trestyn's and Herren's motions to suppress; ORDER that the District Court for the District of Wyoming VACATE Trestyn's and Herren's convictions and sentences; and REMAND for further proceedings consistent with this opinion.