BRISCOE, Chief Judge,
dissenting.
Focusing on the issues actually raised in this proceeding by Wiley, and adhering to the deferential standards of review that we are bound to apply in a case like this, I conclude that the district court properly denied Wiley’s motion to suppress. Consequently, I dissent from the majority’s decision to reverse and remand.
I
Because they are critical to the resolution of this appeal, I begin by outlining the procedural history of this case and the standard of review we must apply to the district court’s decision.

A. Procedural history

Approximately four months after the stop and search of Wiley’s vehicle, the government filed a verified complaint for forfeiture in rem pursuant to 21 U.S.C. § 881(a). The defendant property was the $85,688.00 in United States currency that was seized from Wiley’s vehicle. The government’s complaint alleged that “the Defendant property [wa]s subject to forfeiture ... because it was used to commit, facilitate, was involved in or was proceeds of the commission of violations of 21 U.S.C. §§ 841(a)(1) and 844(a).” Dist. Ct. Docket No. 1 (Complaint) at 2.
Wiley responded by filing a claim for interest in the defendant property and an answer to the government’s complaint. He in turn moved to suppress “all evidence obtained as a result of the traffic stop of his vehicle.” Dist. Ct. Docket No. 29 at 2. In his memorandum in support of his motion to suppress, Wiley conceded that
Trooper Neff may have initially complied with the Terry standards as interpreted by the Tenth Circuit: after running a check on [Wiley’s] vehicle and his documents, Neff apparently did not issue a warning citation, returned [Wi *831 ley’s] paperwork and told him to “[h]ave a nice day.”
Dist. Ct. Docket No. 30 at 9. But, Wiley argued, Trooper Neff “at this point and consistent with his own words, should have permitted [Wiley] to proceed on his way and have a nice day without further delay for additional questioning.” Id. at 9-10. In other words, Wiley argued, Trooper “Neff needed to, but did not, have an objective and reasonable factual basis to justify any further detention or further investigation.” Id. at 10.
After conducting an evidentiary hearing during which the government presented testimony from Trooper Neff, the district court denied Wiley’s motion to suppress. In doing so, the district court concluded that, “under the totality of the circumstances, ... Trooper Neff had an objectively reasonable suspicion,” at the time he returned Wiley’s documents and told him he was free to go, that “Wiley was involved in criminal drug trafficking activity.” App. at 26. And “[t]hat suspicion,” the district court concluded, “warranted ... Wiley’s further detention beyond the investigation of the traffic stop.” Id. at 30.
On May 19, 2011, Wiley moved the district court to reconsider its ruling on his motion to suppress. Citing this court’s then-recently-issued decision in United States v. Trestyn, 646 F.3d 732 (10th Cir.2011), Wiley argued for the first time “that the purpose of the traffic stop premised on suspicion of a registration violation was satisfied when ... Trooper Neff approached ... Wiley’s vehicle on foot and reasonably could have observed that the registration tag displayed a currently registered out of state vehicle.” Dist. Ct. Docket No. 77 at 2. On July 20, 2011, the district court issued a memorandum decision and order denying Wiley’s motion to reconsider. The district court concluded that Whey’s “reliance on” Trestyn was “misplaced in that Trestyn [wa]s easily distinguishable from” Wiley’s case. App. at 32.
On March 27, 2013, the government and Wiley filed a joint motion for final judgment and order of forfeiture. The motion specifically asked the district court “to issue an unopposed order ... forfeiting defendant ... currency ... to the United States, with claimant [Wiley] reserving his right to appeal the Court’s denial of his motion to suppress evidence.” Dist. Ct. Docket No. 108 at 1. The district court granted the parties’ motion and entered a final judgment and order of forfeiture that same day. App. at 35-38.
Wiley filed a notice of appeal on April 29, 2013.

B. Standard of review

“When reviewing a denial of a motion to suppress, this Court accepts the district court’s factual findings, unless they are clearly erroneous, and views the evidence in the light most favorable to the government.” United States v. Trestyn, 646 F.3d 732, 741 (10th Cir.2011). “While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo.” Id.
II
I now turn to address the three issues raised on appeal by Wiley, as well as a new issue raised and resolved by Judge Phillips in his concurrence.

A. Did Trooper Neff have a valid basis for the initial stop?

Wiley argues for the first time in his appellate reply brief that our recent decision in United States v. Esquivel-Rios, 725 F.3d 1231 (10th Cir.2013) “shows that ... *832 the initial stop [in this case] was illegal because Neff was not entitled to rely solely on an unreliable database.” Aplt. Reply Br. at 23 (capitalization altered). I summarily reject this argument. To begin with, we generally do not consider arguments raised for the first time in a reply brief. E.g., Mays v. Colvin, 739 F.3d 569, 576 n. 3 (10th Cir.2014). And, even if we were to consider the argument, nothing in the record calls into question the reliability of the database used by Trooper Neff or the dispatcher. As a result, Wiley’s case is clearly distinguishable from Esquivel-Rios.

B. Should Trooper Neff’s suspicion of a registration violation have dissipated when he walked past Wiley’s license plate?

Wiley argues, as he did in asking the district court to reconsider its ruling on his motion to suppress, that “whatever objective suspicion of a registration violation developed by [Trooper] Neff [should have] dissipated when he walked past Wiley’s license plate which clearly displayed a valid registration sticker, requiring Neff to allow Wiley to be on his way.” Aplt. Br. at 14. In support, Wiley again points to our decision in Trestyn.
Trestyn and the two cases upon which it was based, United States v. McSwain, 29 F.3d 558 (10th Cir.1994), and United States v. Edgerton, 438 F.3d 1043 (2006), all involved traffic stops that originated because of a law enforcement officer’s inability to observe, from a distance, whether the vehicle in question was properly licensed. In McSwain, a Utah Highway Patrol trooper patrolling Interstate 70 observed that the defendant’s vehicle did not have a rear or front license plate, and that the temporary registration sticker appeared to be covered with reflective tape. In Edgerton, a Kansas Highway Patrol trooper on nighttime patrol observed that the defendant’s car “did not have a license plate in its rear brackets, but displayed a plate-sized temporary registration tag in the rear window,” and he “could not read the state of origin or the numbers of the tag from a distance of four to five car lengths.” 438 F.3d at 1045 (internal quotation marks omitted). And in Trestyn, a Wyoming Highway Patrol trooper was patrolling a section of Interstate 80 and observed a “minivan traveling eastbound displaying a rear California license plate but no front license plate.” 646 F.3d at 736. Because the trooper “knew that California law require[d] vehicles to display both front and rear license plates,” id., he stopped the minivan “for the sole purpose of determining whether the minivan violated Wyoming Statute section 31-2-201(d)(vi), which require[d] vehicles traveling in Wyoming but registered in another state to display either registration numbers or license plates in accordance with that state’s laws,” id. at 743.
We held, in each of these cases, that the singular purpose of the stop either was or should have been effectuated by the officer conducting a closer visual inspection of the vehicle’s license plate or temporary registration tag. McSwain, 29 F.3d at 561 (“Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied.”); Edgerton, 438 F.3d at 1051 (“Once Trooper Dean was able to read the Colorado tag and deem it unremarkable, any suspicion that Defendant had violated [Kansas state law] dissipated”); Trestyn, 646 F.3d at 743 (“Once Trooper Nykun approached the minivan on foot, he reasonably could have observed the registration number on the minivan’s license plate” and “should have known that [defendants] did not violate [Wyoming state law]”).
*833 These holdings make perfect sense: when reasonable suspicion for a traffic stop arises from a law enforcement officer’s distant visual observations of a vehicle’s license plate or registration tag, the simplest and best method to confirm or dispel the suspicion is to visually examine the license plate or registration tag at closer range. In other words, a closer visual inspection of the license plate or temporary tag has the potential to “completely dispel[]” the officer’s “reasonable suspicion regarding the validity of’ the license plate or tag. McSwain, 29 F.3d at 561.
Wiley never explains how, precisely, these holdings have relevance to the case at hand, and I submit they do not. It is undisputed that Trooper Neffs reasonable suspicion in this case arose not from any difficulty he had in visually observing Wiley’s vehicle or license plate, but rather from the results of two law enforcement computer database searches (one performed by Trooper Neff from his patrol ear and the second performed by a dispatcher at Trooper Neffs request). And, in turn, Trooper Neffs reasonable suspicion was not limited to the possibility of a registration violation, but rather included the possibilities that Trooper Neff listed in his testimony: that Wiley was using the license plate of the former owner of the vehicle, that the vehicle driven by Wiley was stolen, or that Wiley had stolen valid registration tabs from someone else’s license plate.
In short, I conclude that Trestyn, McSwain, and Edgerton are factually, as well as legally, distinguishable from the case at hand. Consequently, the principles outlined in these cases simply do not provide any useful guidance in the circumstances presented here, let alone justify a conclusion that Trooper Neffs reasonable suspicions could have been dissipated simply by examining the license plate of Wiley’s truck.

C. Should Trooper Neffs suspicion of a registration violation have dissipated after Wiley provided him, with the original motor vehicle title receipt?

Judge Phillips would reverse the judgment of the district court on the basis of an issue never presented by Wiley to, nor resolved by, the district court: whether Trooper Neffs suspicion of a registration violation should have dissipated after Wiley, while sitting in Trooper Neffs patrol vehicle, provided Neff with the “original motor vehicle receipt” for Wiley’s truck.[1] Judge Phillips justifies doing so because, in his view, the “approach” taken by “[t]he parties and the district court” below “failed to appreciate that the reasonable suspicion requirement continues throughout the entire stop.” Phillips Concurrence at 824 (emphasis in original).
But Wiley has been represented by counsel throughout these proceedings, and his counsel presumably made a strategic decision to challenge the search of Wiley’s vehicle and the seizure of the currency based upon the specific arguments that he made to the district court. In turn, the government’s litigation strategy, including the precise questions it chose to pose to Trooper Neff during the suppression hearing, were presumably fashioned to respond to Wiley’s arguments.[2] Because these *834 strategic decisions effectively framed the record, the district court’s decision, and the scope of this appeal, it is not our place to start from scratch, reexamine the case, and decide for ourselves what issues we believe are important and should have been raised.
In any event, even if we were free to inject new issues into the case at this late juncture, I would disagree with Judge Phillips that Trooper Neffs reasonable suspicion of a registration violation dissipated entirely at the point at which Wiley handed the “original motor vehicle receipt” to Trooper Neff. Viewing the evidence in the record in the light most favorable to the government, I note that Trooper Neff specifically expressed a concern that the vehicle driven by Wiley might have been stolen, and the provision by Wiley of the “original motor vehicle receipt” would not necessarily have resolved that concern. Indeed, Trooper Neff testified under cross-examination at the suppression hearing, when asked about the “original motor vehicle receipt,” that he “needed to be able to verify the VIN numbers on the vehicle to make sure that this truck ... matched to” the receipt. App. at 136. And, in fact, the record indicates that, near the end of the stop, Trooper Neff attempted to resolve his concerns regarding whether the vehicle was stolen by comparing the VIN numbers listed on the “original motor vehicle receipt” to the VIN numbers that were actually on Wiley’s truck. In my view, it was not until after that time that Trooper Neffs reasonable suspicion regarding the rightful ownership of the vehicle was entirely dissipated.

D. Did Trooper Neff, at the conclusion of the traffic stop, have reasonable suspicion that Wiley was engaged in drag trafficking?

Finally, Wiley argues that his case “is indistinguishable from” United States v. Wood, 106 F.3d 942 (10th Cir.1997) because his “detention ... after the completion of the traffic stop was not supported by objective facts amounting to reasonable suspicion of any crime, let alone the specific crime of drug trafficking.” Aplt. Br. at 14. For the reasons that follow, I reject this argument.
“Absent valid consent, the scope or duration of an investigative detention may be expanded beyond its initial purpose only if the detaining officer at the time of the detention has a particularized and objective basis for suspecting the particular person stopped of criminal activity.” Wood, 106 F.3d at 946. “[Ojnce an officer returns the driver’s license and vehicle registration” and advises the driver he or she is free to go, “he must allow the driver to proceed without further detention or questioning unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity.” United States v. Lyons, 510 F.3d 1225, 1237 (10th Cir.2007). We look to the totality of the circumstances in evaluating whether the officer had an objectively reasonable basis to prolong the detention. Id. “This process allows officers to draw on their own experience and specialized train *835 ing to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.” United States v. Santos, 408 F.3d 1120, 1134 (10th Cir.2005).
The government in this case points to several factors that it asserts “provided ... [Trooper] Neff with reasonable suspicion of drug trafficking and justified prolonging the stop.” Aplee. Br. at 22. I shall proceed to address these factors, first individually, and then collectively.

1) Wiley’s purported travel plans.

“We have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity.” United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir.2001). In this case, Wiley did not offer any contradictory statements about his travel plans. Rather, he consistently told Trooper Neff that he was driving from his home in Missouri to southern California to visit an aunt and some friends. But Trooper Neff found two aspects of Wiley’s story unusual, if not implausible. First, Trooper Neff thought it was unusual that Wiley had detoured from 1-70 north to 180 in Colorado in order to view the scenery in Wyoming on 1-80. Second, Trooper Neff thought it was implausible that Wiley was driving west out of Salt Lake City on 1-80 to his purported destination in southern California. That is because 1-80 runs through both northern Utah and northern Nevada and leads not to southern California but rather to San Francisco, California. And based on his training and experience, Trooper Neff was aware that 1-80 is considered to be a major route for the cross-country transportation of drugs and large sums of money, and that northern California and the San Francisco Bay area are known sources of high-grade marijuana. Consequently, I conclude that we must consider Wiley’s travel plans as a factor towards reasonable suspicion.
The government also notes that Trooper Neff testified at the suppression hearing that he was suspicious of Wiley’s story that he was traveling to southern California in order to help out an elderly aunt. According to Trooper Neff, he had previously encountered people involved in criminal activity who had said they were traveling to visit a sick relative, and in Trooper Neffs view it is a “tactic ... that they use ... to persuade law enforcement as to, you know, I’m a good person; this is what I’m going to go do.” App. at 90.
I am not persuaded, however, that we must defer to Trooper Neffs judgment on this particular factor. As we have noted, “[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous.” United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir.2010) (quotation marks omitted). Nothing about traveling to assist a relative is inherently implausible, nor does it lend itself in any way to a particular suspicion about criminal conduct. Consequently, I afford this fact no weight in terms of assessing reasonable suspicion.

2) Wiley’s criminal history and Wiley’s failure to admit that history.

Criminal history, in conjunction with other factors, “contributes powerfully to the reasonable suspicion calculus.” Id. (quotation marks and italics omitted). “Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior.” Id.
In this case, Trooper Neff learned through dispatch that Wiley had a prior conviction for marijuana possession, as well as a paraphernalia-related conviction. *836 Notably, that information contradicted Wiley’s statement to Trooper Neff that he only had a prior DUI conviction. We have held that “lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion.” Id. at 1149. Together then, these two factors, i.e., the fact that Wiley had a prior drug-related conviction and Wiley’s apparent concealment of that conviction from Neff, “weight] heavily in favor of finding reasonable suspicion.” Id. at 1147.

3) The appearance and contents of Wiley’s truck.

The government points to what it believes are several incriminating aspects of the appearance and contents of Wiley’s truck.

a)Passenger window

The government first notes that when Trooper Neff initially approached the passenger side of Wiley’s truck, Wiley rolled the passenger side window down a mere three or four inches. Trooper Neff testified at the suppression hearing that, based upon his experience, there could have been innocent reasons for this action, such as a broken window, or suspicious reasons, such as the driver wanting to hide the odor of something incriminating inside the vehicle, such as drugs. App. at 78. I conclude that this factor weighs somewhat in favor of reasonable suspicion, at least when it is considered in conjunction with the can of Febreze air spray that was found in the passenger compartment of the truck (a factor that is discussed in greater detail below). See United States v. Ludlow, 992 F.2d 260, 264 (10th Cir.1993) (affirming district court’s denial of motion to suppress, which was based in part on a finding that the driver “did not roll [his] window all the way down,” thereby “raising] the suspicion that there was an odor in the car that the driver did not want out”).

b)Presence of Febreze can

When Trooper Neff opened the passenger side door of Wiley’s truck to speak with Wiley (as a result of being unable to communicate with Wiley due to Wiley only rolling the passenger side window down 3 to 4 inches), he observed inside the passenger compartment of the truck a can of Febreze air spray. Trooper Neff testified that his law enforcement training taught him that drug traffickers frequently use odor-masking agents, such as Febreze, to attempt to conceal the odor of narcotics. And, Trooper Neff testified, consistent with that training, he frequently sees defendants in marijuana and methamphetamine cases using Febreze or air freshener sheets as odor-masking agents. As a result, Trooper Neff viewed the presence of the Febreze can in Wiley’s truck as an “indicator” of possible criminal conduct. App. at 56.
We have consistently acknowledged that the presence of an odor masking agent, such as Febreze, may give rise to reasonable suspicion on the part of law enforcement officials that the agent “is being used to mask the smell of drugs.” United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir.1998); see United States v. West, 219 F.3d 1171, 1178-79 (10th Cir.2000) (“The Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis.”). Thus, I conclude that the presence of the Febreze can in this case must be weighed in favor of finding reasonable suspicion.

c)Energy drink and coffee mug

Trooper Neff also observed on the front passenger seat of Wiley’s truck a large container of energy drink mix and a coffee *837 mug. Based upon his law enforcement training, Trooper Neff viewed these two items as indicators of possible criminal conduct. At the suppression hearing, Trooper Neff testified that both items indicated to him “that this driver wants to stay awake.” App. at 85.
The problem, as Trooper Neff himself conceded at the suppression hearing, is that such items are commonly used by all drivers, not just individuals involved in criminal activity. And, indeed, in Simpson we “g[a]ve little weight” to the presence of “energy pills” in the defendant’s vehicle because, we noted, it is “likely to find such items in the vehicle of any traveler.” 609 F.3d at 1152. I therefore follow a similar path in this case and afford little or no weight to the presence of the energy drink mix and the coffee mug in Wiley’s truck.

k) Wiley’s recent truck purchase.

The government notes that Trooper Neff, and in turn the district court, also relied on the fact that Trooper Neff believed that Wiley’s truck was new and worth more than the price Wiley reported having paid.
During the suppression hearing, Trooper Neff testified that Wiley’s truck appeared to him to be new. App. at 137. But Trooper Neff subsequently conceded, and a review of the video of the stop confirms, that Wiley correctly informed him that the truck was a 2002 model with nearly 68,000 miles on it. During the stop, Trooper Neff learned from Wiley’s paperwork that Wiley had paid $5,000 for the truck. Tr. of Stop at 9 (“So you bought this for 5,000 bucks?”). Trooper Neff then asked Wiley, ‘Wow, where did you get that kind of deal?” Id. at 9-10. Wiley proceeded to explain that the market for such trucks had “collapsed” and that the owner, who was a neighbor, “needed to get rid of it.” Id. at 10. When Trooper Neff asked “[H]ow much does this [truck] retail for?,” Wiley responded, “You know, they’re advertising them for, like, seven or eight [thousand], depending on where they’re at. But they’re not selling and everything’s sitting.” Id. At the suppression hearing, Trooper Neff testified that he did not believe that $5,000 was the true value of the truck. App. at 176. Trooper Neff further testified that, in his experience, drug trafficking organizations purchase vehicles at low cost for drug runners to use. Id. Consequently, Trooper Neff testified that this was a factor that supported his reasonable suspicion that Wiley was engaged in illegal activity. Id.
I conclude that this factor carries no weight. Although Trooper Neff expressed skepticism at the suppression hearing that $5,000 was the true value of the truck, the only relevant evidence in the record on the point is Wiley’s statements to Trooper Neff that trucks of similar type and age were being advertised for sale for $7,000 to $8,000, but that no one was buying them at that price. Moreover, Trooper Neff did not dispute or reasonably question that Wiley actually purchased the truck from a neighbor who had experienced difficulty in selling the truck.

5) Wiley’s unemployment.

According to the government, “Wiley’s unemployment aroused Trooper Neffs suspicion in combination with the other factors because in his experience ninety-five percent of drug traffickers have no other employment.” Aplee. Br. at 32. It is true that unemployment can weigh in favor of reasonable suspicion when it is considered in combination with other relevant factors. E.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir.2006) (noting defendant’s unemployment made it unlikely that he made an innocent cross-country drive from New *838 York to California, stayed for less than two days, and purchased a vehicle in California that he drove back to New York). The problem here, however, is that the government has not explained precisely what other factors we should consider in combination with Wiley’s unemployment.[3] And the government, understandably, makes no attempt to argue that unemployment, standing alone, gives rise to reasonable suspicion. Consequently, I afford Wiley’s unemployment no weight.

6) Wiley’s nervousness.

Finally, the government asserts that Wiley exhibited an unusual level of nervousness. “We have held consistently that nervousness is of limited significance in determining whether reasonable suspicion exists.” Simpson, 609 F.3d at 1147 (internal quotation marks omitted). Two reasons justify this position. Id. “First, it is common for most citizens, whether innocent or guilty — to exhibit signs of nervousness when confronted by a law enforcement officer.” Id. (internal quotation marks omitted). “Second, unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.” Id. at 1147-48. Only when a defendant exhibits “[ejxtreme and persistent nervousness” may this factor be “entitled to somewhat more weight.” Id. at 1148 (internal quotation marks omitted).
It is true that the record on appeal suggests that Wiley was nervous throughout the traffic stop. Shortly after Wiley entered the patrol car, Trooper Neff asked Wiley if he was nervous and Wiley responded, “Just don’t want any tickets.” Tr. of Stop at 4. Trooper Neff testified at the suppression hearing that, later on during the stop, Wiley’s hands were shaking as he looked through his cell phone for the phone numbers for his aunt and friend. App. at 177. Lastly, Trooper Neff testified that Wiley’s nervousness continued even after Neff informed him that he would not be receiving a ticket. Id.
The problem, however, is that it is not clear from the record that Wiley’s nervousness during the stop was “extreme.” At worst, the record indicates that Wiley’s hands were shaking while he looked through his cell phone for the numbers for his aunt and friend. Otherwise, the specific aspects of his nervousness are neither exhibited by the video of the stop (which does not show either Trooper Neff or Wiley while they were sitting in the patrol car) or by Trooper Neffs testimony at the suppression hearing. Consequently, I am unable to give this factor much, if any, weight.

7) Conclusion

Although it is a close case, I am persuaded that the totality of the circumstances outlined above, specifically Wiley’s implausible or unusual travel route, Wiley’s prior drug-related conviction and his failure to admit that history to Trooper Neff, the fact that Wiley only rolled down the passenger window three to four inches when first approached by Trooper Neff, and the presence of a can of Febreze air spray on the passenger seat, provided *839 Trooper Neff with a reasonable and articu-lable suspicion that Wiley was engaged in drug-related activity, i.e., either possessing and transporting drugs or traveling to northern California to purchase and/or transport drugs back home. Consequently, I conclude that Trooper Neffs continued detention of Wiley was reasonable and did not violate the Fourth Amendment.
Ill
For these reasons, I would affirm the district court’s order denying Wiley’s motion to suppress evidence.

. I note here that Wiley did not have a vehicle registration form for the 2002 Toyota Tundra pickup truck he was driving and the GEICO EVIDENCE OF INSURANCE document he provided Trooper Neff was for a 1999 Honda Accord.

. Judge Phillips criticizes the government for failing to “me[e]t its burden to show that ... *834 reasonable suspicion [existed] from the beginning of the stop until the dog’s sniff of the outside of Wiley's truck.” Phillips Concurrence at 826. But I would suggest that, given the narrow scope of the issues raised by Wiley in his motion to suppress, the government was, appropriately enough, unaware that it was operating under any burden to explain precisely every step that Trooper Neff took during the course of the stop. Had Wiley argued the issue now raised by Judge Phillips, the government almost certainly would have broadened the scope of its direct examination of Trooper Neff during the suppression hearing.

. The two factors that are arguably inconsistent with Wiley’s unemployment were (1) his ability to afford a cross-country trip, and (2) his recent purchase of the truck. But Wiley explained to Trooper Neff that he was able to do both because he had saved money from when he was working, and because his parents were assisting him. On the other hand, Wiley’s unemployment obviously made it possible for him to take a cross-country trip of open-ended length, and it arguably explained his desire to drive as far as possible without stopping.